William H. and Martha C. Leonhart v. Commissioner.
Leonhart v. Commissioner
Docket No. 6743-65.
United States Tax Court
T.C. Memo 1968-98; 1968 Tax Ct. Memo LEXIS 199; 27 T.C.M. (CCH) 443; T.C.M. (RIA) 68098; May 27, 1968. Filed Chapman H. Belew, Jr., for the petitioners. Charles F. T. Carroll, for the respondent. 444 KERN Memorandum Findings of Fact and Opinion KERN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax in the following amounts for the following years: Year
Income tax deficiency
Additions to tax Sec. 6653(a)
1960
$24,611.16
$1,230.56
1961
19,884.64
994.23
The hearing *202 of this case occupied six days. Over 200 exhibits were introduced by the parties. A very large number of relatively small factual questions of a type usually settled by counsel before or during the trial of a case remain unresolved. Petitioner William H. Leonhart is the sole shareholder of Leonhart and Co., Inc., sometimes hereinafter referred to as Leonhart, Inc., which was in the years in question a qualifying small business corporation under Subchapter S of the Internal Revenue Code of 1954. The deficiencies in petitioners' tax relate both to adjustments made with respect to income of Leonhart, Inc., attributable to these petitioners and to disallowed deductions claimed on account of expenditures made by petitioners in their individual capacties. Concessions have been made by both sides. The many issues remaining for our determination may be stated or classified as follows: 1. Whether the statute of limitations precludes the respondent from adjusting petitioners' income in 1960 and 1961 by reason of adjustments in the income of Leonhart, Inc., in those years. 2. Whether petitioners are entitled to certain charitable deductions for the years 1960 and 1961 in addition to those *203 allowed by the Commissioner. 3. Whether Leonhart, Inc.'s change in its method of accounting with respect to its reporting of certain commission income from the American Fire and Casualty Company in 1960 and continuing in 1961 without the consent of the Commissioner requires its income to be recomputed under its prior method of accounting for this item for 1960 and 1961. 4. Whether Leonhart, Inc., is entitled to deductions in addition to those allowed by the Commissioner for amounts paid to Harold's sons Bill and Jay in 1960 and 1961 as salary and for employment taxes paid by it with respect thereto. 5. Whether Leonhart, Inc., is entitled to deduct in 1960 as part of its advertising expenses payments incident to publishing the biography of the founder of the Civitan Club International. 6. Whether Leonhart, Inc., is entitled to deduct any amounts for depreciation and expenses relating to the "Leonhart Music Club" for 1960 and 1961. 7. Whether Leonhart, Inc., is entitled to deductions claimed for automobile expense and depreciation in 1960 and 1961 in addition to those allowed by the Commissioner, and for the loss on a sale of an automobile. 8. Whether Leonhart, Inc., is entitled *204 to a deduction for legal expenses paid in 1961 in addition to that allowed by the Commissioner. 9. Whether petitioners or Leonhart, Inc., are entitled to deductions for various items claimed to be travel and entertainment expenses for 1960 and 1961 in addition to those allowed by the Commissioner. 10. Whether certain alleged deductions are claimed for the first time on brief and are therefore not to be allowed in this proceeding. 11. Whether Leonhart, Inc., may properly deduct as a business expense a part of the cost of maintaining petitioners' summer house in 1960. 12. Whether petitioners are subject to additions to tax in 1960 and 1961 under section 6653(a), I.R.C. 1954. General Findings of Fact Some of the facts have been stipulated, and they, together with attached exhibits, are found to be as stipulated. Petitioners, husband and wife, are residents of Baltimore, Maryland. For the taxable years 1960 and 1961 they timely filed joint income tax returns with the district director of internal revenue at Baltimore, in which they reported for 1960 adjusted gross income in the amount of $58,903.05 and taxable income in the amount of $40,870.95 and *205 for 1961 adjusted gross income in the amount of $67,893.38 and taxable income in the amount of $49,175.95. The notice of deficiency sent to petitioners under date of August 27, 1965, stated deficiencies based upon respondent's determination that petitioners' corrected taxable income for 1960 was $80,190.30 and for 1961 was $81,191.31, resulting from the following adjustments: 445 1960
1961
Taxable income as disclosed by return
$40,870.95
$49,175.95
Unallowable deductions and additional income:
(a) Subchapter S Corporation income understated
38,506.26
32,212.22
(b) Contributions
419.60
265.00
(c) Exemption
600.00
Total
$80,396.21
$81,653.17
Nontaxable income and additional deductions Dividends
205.91
202.26
Casualty loss
259.60
Corrected taxable income
$80,190.30
$81,191.31
Petitioner William H. Leonhart, sometimes hereinafter referred to as Harold, is and was during the period in question the sole shareholder of Leonhart, Inc. On January 30, 1960, Leonhart, Inc., elected to be taxed as a small business corporation under section 1372 of the Internal Revenue Code of 1954, which election remained effective *206 for 1960 and 1961. In those years Leonhart, Inc., filed timely tax returns required of electing small business corporations. While Leonhart, Inc., had a board of directors and officers (such as Vice Presidents, [1] Treasurer and Secretary), Harold had not only the ultimate control over it by reason of his ownership of all of its stock but also complete operational control over all phases of its business. Leonhart, Inc., was incorporated under the laws of Maryland in 1953. During 1960 and 1961 the primary business of Leonhart, Inc., was that of reinsurance brokerage. Reinsurance is, broadly speaking, a method by which an insurance company can reduce its potential liability on an insurance policy or group of policies it has issued by itself contracting with a reinsurance company so that *207 the latter assumes a portion of the risk initially assumed by the former. Leonhart, Inc., filed its federal income tax returns for its calendar years 1960 and 1961 and kept its books on a cash basis with the exception of one item of income hereinafter described in some detail. Two basic types of reinsurance contracts, sometimes known as treaties, are "excess of loss" and "quota share" contracts. On an "excess of loss" contract the reinsured assumes all the risk up to a certain amount and the reinsurer agrees to assume all liability in excess of that figure. Under a "quota share" contract the reinsurer assumes a percentage of the risk from "the ground up." The role of Leonhart, Inc., as a reinsurance broker was to bring together insurance companies desiring reinsurance (buyers) and reinsurance companies (sellers) who would be willing to assume a part of the risk of the primary insurer in return for the payment to them of a part of the premiums paid by the insured to the primary insurer. Leonhart, Inc., placed a large proportion of its business with syndicates of insurance underwriters associated with Lloyd's of London although it dealt also with American and other European reinsurers. *208 Leonhart, Inc., placed reinsurance with them through any one of four or five brokers authorized "to go on the floor at Lloyd's and place business." At various times Leonhart, Inc., has dealt with reinsurance companies located in the United States, England, Germany, France, Belgium, the Netherlands, Italy, the Scandinavian countries and Switzerland. Generally, American reinsurance companies require the reinsured to remit the reinsurance premiums directly to them, out of which the broker is paid, whereas European reinsurance companies rely on the broker to collect the reinsurance premiums and, after deducting the commission due, to pay the premiums over to them. The commissions Leonhart, Inc., receives run about 2 or 2 1/2% of the premiums paid by the reinsured on a "quota share" contract and from 5 to 10% on an "excess of loss" contract since the premiums payable to the reinsurer under the latter would be a lower percentage of the premiums paid to the primary insurer than those under a "quota share" contract. Leonhart, Inc., reported commission income for 1960 of $186,442.93 and for 1961 of $210,990.95, derived from 446 reinsurance contracts obtained by it for domestic insurers *209 located in many parts of the United States. Leonhart, Inc., ranks about tenth in volume of reinsurance placed by the approximately 100 reinsurance intermediaries in this country. Harold, in addition to being the sole shareholder of Leonhart, Inc., was also the sole shareholder of Leonhart and Company of Maryland, hereinafter sometimes referred to as Leonhart of Maryland, which was incorporated under the laws of that state in 1951. Leonhart of Maryland was formed in order to conduct the insurance brokerage business formerly handled by Leonhart, Inc., which from that time dealt almost exclusively in reinsurance brokerage. Southern Underwriters, Inc., hereinafter sometimes referred to as Southern Underwriters, was a corporation organized around 1941. In 1960 and for some years prior thereto its stock was owned in equal proportions by Walter Hayes, the president of American Fire and Casualty Co., George Bradshaw, the executive vice-president of that company, and by Harold. Its putative purpose was to act as an intermediary for American Fire and Casualty Co. in procuring reinsurance. It also serviced such reinsurance contracts. Southern Underwriters procured such reinsurance through *210 Leonhart, Inc. For several years prior to 1960 the profits of Southern Underwriters were distributed as "management fees" to the wives of its stockholders. In 1960 and 1961 Southern Underwriters reported gross income in the respective amounts of $37,265.04 and $63,611.73. During 1961 Hayes and Bradshaw disposed of their stock in Southern Underwriters and Harold increased the amount of its stock owned by him to 70%. Of the remaining 30% of its stock, 10% was acquired by Margaret Sands, the Secretary of Leonhart, Inc., and 20% by a man named Dig. Southern Underwriters and Leonhart, Inc., acted in close cooperation with regard to the procurement and servicing of reinsurance contracts for American Fire and Casualty Co., and each of them was financially interested in obtaining and retaining this business relationship. The brokerage fees received by Leonhart, Inc., on the reinsurance contracts thus procured for American Fire and Casualty Co. constituted an important source of its income. Harold is prominent in the reinsurance field internationally and has taken an active part in civic affairs on the local and national levels. In addition to Harold and Martha the Leonhart family included *211 the following children who had attained the following ages as of January, 1960: Valerie
9
Marybelle
12
Jeanne
15
John
15
Jay
19
Bill
21
Petitioners employed the services of a certified public accountant from 1953 through the years in question to aid in the accounting work of the various corporations in which Harold had an interest and to aid in the preparation of the tax returns of Harold and Martha as well as those of the corporations. The financial records of Harold and Leonhart, Inc., for 1960 and 1961 were for the most part kept in detail. An agent of the Commissioner testified that the primary books of entry of Leonhart, Inc., "were of an adequate nature." Aside from the issue relating to an alleged change in method of accounting, the great majority of the items contested relate to deductions claimed by the petitioners herein or by Leonhart, Inc., on account of expenditures which for the most part are conceded by respondent to have been made but which have not been allowed by him on the ground that petitioners have not shown them to be allowable under any provision of the Internal Revenue Code. Additional Findings of Fact Relating to Issue 2 *212 In petitioners' income tax return for 1960 deductions on account of charitable contributions were claimed in the total amount of $3,819.92 of which respondent disallowed $419. In their return for 1961 petitioners claimed deductions on account of charitable contributions in the total amount of $4,746.36, of which respondent disallowed $265. As to those items claimed as charitable deductions on the returns for the taxable years concessions have been made by both respondent and petitioners as a result of which there remain at issue only the deductions claimed on account of payments made by petitioners in 1960 to "Hibernian Society" and to "Reverend Elbert Gay" in the respective amounts of $5 and $50. 447 The Hibernian Society is an organization qualifying under section 170, I.R.C. 1954. The record herein does not disclose the identity of "Reverend Elbert Gay" or the purpose for which petitioners made the payment to him. A number of items which were not claimed as charitable deductions on petitioners' returns were alleged to be deductible as charitable contributions in petitioners' amended petition. Concessions have been made by both parties with regard *213 to these items but there remain at issue the following: cash contributions alleged to have been made by petitioners to their church in 1960 and 1961 in the estimated amounts of $520 each year, a payment of $50 made by petitioners in 1961 to "St. Mary's Building Fund," and a payment of $25 made by petitioners in 1961 to "The Evergreen Annual." Petitioners' alleged cash contributions to their church and their payment of $50 in 1961 to "St. Mary's Building Fund" will be considered infra, in those parts of our findings and of our opinion set forth under "Issue 10." Although the check evidencing petitioners' payment to The Evergreen Annual bore the notation "contribution" it was characterized by Harold in his oral testimony as being for a business advertisement related to Leonhart, Inc., placed by him in a Loyola College (Maryland) yearbook and we so find. Its deductibility as a business expense is considered infra, in those parts of our findings and of our opinion set forth under "Issue 9." Additional Findings of Fact Relating to Issue 3 In the "Explanation of Adjustments" attached to the notice of deficiency, respondent stated: 1. It is determined that gross income was understated *214 for the years 1960 and 1961, in the respective amounts of $14,929.08 and $15,596.15, caused by a change in your method of accounting from that previously used by you to compute your income. Since you failed to secure the prior consent of the Commissioner of Internal Revenue Service to change your method of accounting, your gross income has been computed under that method regularly used by you. Section 446 of the Internal Revenue Code. In all relevant years petitioners Harold and Martha reported income on their individual income tax return on a cash basis and Leonhart, Inc., reported its income on a cash basis except with regard to its income received as commissions on reinsurance policies written for American Fire and Casualty Co., which were reported on an accrual basis until 1960. American Fire and Casualty Co., a primary insurer, acting through Southern Underwriters, Inc., purchased practically all of its reinsurance from syndicates of underwriting members of Lloyd's of London through Leonhart, Inc., as broker. Among the types of reinsurance procured for American Fire and Casualty Co. (hereinafter sometimes referred to as "American Fire") by Leonhart were *215 inland marine, aviation, fire and allied lines, and workman's compensation treaties. Each reinsurance premium was paid by American Fire to Southern Underwriters, which would, after deducting the commission due Leonhart, Inc., forward the balance of the premium to Lloyd's underwriters. Southern Underwriters did not itself charge any commission in connection with the reinsurance contract involved in this issue. The amount of reinsurance premiums due from a primary insurer to a reinsurer under a reinsurance contract is calculated on the basis of the insurance premiums received by the primary insurer. The timing of the payment of the reinsurance premium is normally determined in one of two ways. On the so-called "written premium basis" the reinsurance premium is calculated and payable on the basis of the amount of primary insurance issued, or "written," during a given period. It was on this basis that the reinsurance premium payable under Contract No. 4112, a reinsurance contract between American Fire and the Lloyd's underwriters in fire and allied lines, was calculated and remitted (through Southern Underwriters) by American Fire to the Lloyd's underwriters from the inception of the *216 contract in 1956 until 1960. Under this method American Fire submitted monthly reports to Southern Underwriters which in turn transmitted them to the reinsurer reflecting the amount of primary insurance issued or "written" by American Fire during the month covered by the report and a calculation of the reinsurance premium due from American Fire relating to that primary insurance. It was the practice of the Lloyd's underwriters to send confirmation of the figures contained in the monthly reports submitted by American Fire to Southern Underwriters for transmittal to 448 American Fire. After confirmation was received by American Fire, it would be billed by Lloyd's underwriters. Although American Fire could and sometimes did remit the amount payable at an earlier time, it was not required to do so under the terms of Contract No. 4112 until after submitting a quarterly statement of account to the Lloyd's underwriters. The portion of Contract No. 4112 relating to these requirements follows: ARTICLE XIII The COMPANY [American Fire] agrees to submit through Messrs. Leonhart & Co., Inc., to Messrs. Joseph Hadley (Insurance) Limited, King William Street House, Arthur Street, London, *217 E.C. 4. for transmission to the REINSURERS a monthly statement of written premiums subdivided by class of risk together with bordereaux of paid and outstanding losses subdivided by class of risk and cause of loss. In addition, the COMPANY shall also forward as soon as possible and not later than forty five (45) days after the close of each calendar quarter a statement of account on which the REINSURERS shall be credited with: - (a) The Gross Written Premiums less Return Premiums and Cancellations entered during the quarter in question. (b) The amount of the Reserve Fund retained during the corresponding quarter of the previous year. (c) The amount of outstanding losses and loss adjustment expenses as of the end of the preceding quarter. and shall be debited with: - (d) Forty three and three quarters per cent (43 3/4%) ceding commission on the Gross Written Premiums less Returns and Cancellations entered during the quarter in question. (e) Fifty per cent (50%) of the Net Written Premiums (as defined in Article XI hereof) entered during the quarter in question for the Reserve Fund: (f) The amount of losses and loss adjustment expenses less recoveries paid during the quarter *218 in question (exclusive, however, of any losses paid by special remittance as provided for in Article XII hereof). (g) The amount of outstanding losses and loss expenses outstanding as of the end of the quarter in question. The resultant balance due to the creditor party by the debtor party shall become payable not later than ninety (90) days after the close of the quarter in question. All transactions hereunder shall be payable in United States dollars. The usual term of a reinsurance treaty is one year. On December 20, 1960, American Fire instructed Harold to amend reinsurance Contract No. 4112 from a "written premium basis" to an "earned premium basis" effective at midnight December 31, 1960. The "earned premium basis," as described by one of petitioners' witnesses, is as follows: On the earned premium basis, the unearned premium takes the same status as the inventory of a merchandising concern. We take the unearned premium at the beginning of the year, and to that we add the premiums written, and then subtract the unearned premiums at the end of the year, and that gives you the earned [premium.] On December 28, 1960, Harold wrote one of his London brokers, Ronald Hadley, *219 requesting the change, stating that although he regretted the necessity for the change because it required refund of brokerage by Leonhart, Inc., the "written premium basis" of reporting was causing problems in the statistical department of American Fire. The first paragraph of this letter read as follows: I enclose herewith letter from George S. Bradshaw which is self-explanatory and it occurs to me that Underwriters might prefer to make the amendment effective 12:01 a.m. January 1, 1961, rather than December 31, 1960, at midnight, however, if it is at all possible, the reassured would appreciate the amendment as requested. On January 11, 1961, Harold's London broker cabled that the reinsurers had agreed to the change from the "written" to the "earned premium basis" and Harold wired this information to American Fire that same date. The treaty was amended on January 23, 1961, to be effective 12:01 A.M. on January 1, 1961. The pertinent parts of this amendment are as follows: Notwithstanding anything which may be contained herein to the contrary, it is understood and agreed that effective 12:01 a.m. 1st January, 1961 and with respect to all in force business at this time together *220 with new and renewals thereafter, accounting for premiums hereunder shall be on an "earned" basis. In consequence of this amendment, Reinsurers agree to return to the Reassured the unearned premium on in force business at 12:01 a.m. 1st January, 1961 against the release of all premium reserve amounts held by the Reassured. 449 As a result of this amendment to the contract the Lloyd's underwriters were required to refund to American Fire an amount determined to have represented reinsurance premiums paid to them in excess of the amount which would have ben payable to the reinsurer by the primary insurer, American Fire, had the reinsurance premiums been calculated on the "earned premium basis." The refund was made by the Lloyd's underwriters to American Fire through Southern Underwriters, which refunded the premiums originally paid by American Fire not diminished by the broker's commission originally withheld. The premiums paid by American Fire to Southern Underwriters in 1960 under Contract No. 4112 which were required to be refunded as a result of the change to an "earned method" amounted to $252,276.27. Of this amount $13,411.81 had been withheld by Southern Underwriters and *221 remitted to Leonhart, Inc., as brokerage commission, and the balance of $238,864.46 had been paid to the Lloyd's underwriters in 1960. After the change the reinsurers refunded the $238,864.46, adjusted for reasons not relevant herein, to Southern Underwriters in two payments made on May 8, 1961 and May 26, 1961. Southern Underwriters refunded to American Fire the gross premiums of $252,276.27, adjusted for the same reasons, in three payments made on May 5, 1961, May 26, 1961, and July 20, 1961, which refund included in its third payment the commission relating to the premiums originally received by Leonhart, Inc. The commission received by Leonhart, Inc., in 1960 in the amount of $13,411.81, was refunded to Southern Underwriters by a check drawn by Leonhart, Inc., to it dated July 19, 1961. In 1959 Leonhart, Inc., which was on a cash basis of accounting for income tax purposes for all items except commissions received under all American Fire contracts, including Contract No. 4112, reported the income received under this contract on an accrual basis. Under this method when American Fire forwarded monthly reports to Lloyd's underwriters through Leonhart, Inc., showing premiums written *222 during that period, Leonhart, Inc., would calculate the commissions due thereon and take them into income. Leonhart, Inc., had reported its American Fire commission income in this manner since 1955. For 1960 Leonhart, Inc., began reporting all commission income from American Fire on a cash basis. For November and December of 1960 Leonhart, Inc., had accrued $14,929.08 of commissions from American Fire which were not received in 1960 and thus not reported as income in its return for that year under Leonhart, Inc.'s new cash method of accounting with respect to that item. Under Leonhart, Inc.'s prior accrual method this amount would have been reported as income in 1960. This amount was taken into income by Leonhart, Inc., in 1961. In 1961 Leonhart, Inc.'s change in its method of accounting resulted in a deferral to a later period of $14,264.93 accrued in the third quarter and $16,260.30 accrued in the fourth quarter of that year but not received. Under Leonhart, Inc.'s old method of accounting these amounts, totalling $30,525.23, would have been taken into income in 1961, reduced by the $14,929.08 which was deferred from 1960 to 1961 under the new system. In order to reflect the *223 above-mentioned refund made by Leonhart, Inc., to American Fire relating to Contract No. 4112 Leonhart, Inc., deducted $5,000 in 1960 and the balance of $8,411.81 in 1961. Leonhart, Inc., did not seek the permission of the Commissioner in effecting the change in the method of reporting income from American Fire commissions. Ultimate Finding of Fact Relating to Issue 3 Leonhart, Inc.'s change in method of accounting amounted to a change in the treatment of a material item within the meaning of section 446(e), I.R.C. 1954. Additional Findings of Fact Relating to Issue 4 Leonhart and Co., Inc., claimed the following amounts as deductions for salaries paid to Harold's sons William (hereafter referred to as Bill) and Jay and for employment taxes paid by it thereon: 1960
1961
Salary
Tax
Salary
Tax
Bill
$1,700
$81.60
$2,500
$125.00
Jay
$ 400
$19.20
$2,300
$115.00
The respondent disallowed all of the claimed deductions save $1,000 paid to Bill for work done by him in the first five months of 1960 and the employment tax relating thereto. The parties agree that payments were made in the full amount claimed *224 by Leonhart, Inc., and that employment taxes with respect thereto were paid in the amount of 4.8% of the disallowed salaries in 1960 and 5% in 1961. 450 In January of 1960 Jay was 19 years old and a student at Loyola College in Baltimore. In the summer of that year he enrolled in the Berkeley School of Music in Boston, Massachusetts, where he remained as a full-time student until the summer of 1961. In November of 1960 Harold wrote to Jay and suggested that if Jay were to qualify himself to act as a countersigning agent on certain insurance policies in Massachusetts he could earn about $2,000 per year. Following this communication Leonhart, Inc., began paying Jay $200 per month. In order to qualify as a countersigning agent it was necessary for Jay to pass a Massachusetts insurance examination. Jay did not take the examination and therefore did no countersigning. On December 6, 1960, Harold flew to Boston to take part in an undisclosed number of conferences during that week with respect to a reinsurance account of Leonhart, Inc. Jay attended one or two of these meetings. The record does not disclose the capacity in which Jay attended these meetings or what, if any, his contributions *225 to them were aside from Harold's testimony to the effect "Mr. Obrecht [a representative of a client of Leonhart, Inc.] was quite a devotee of old jazz records and he and Jay got along quite well on that [subject.]" In the summer of 1961 Jay played with a professional orchestra and did not return to Baltimore. In the fall of 1961 Jay enrolled at the Toronto School of Contemporary Music in Toronto, Canada, where he remained until the end of the year. Bill Leonhart was 21 years old in 1960. In the previous year Bill had taken a course in insurance at the American Fire and Casualty Co. in Orlando, Florida. In January of 1960 Bill began working full time for Leonhart, Inc., in Baltimore at a monthly salary of $200. The primary purpose of this employment was to familiarize him with the operations of Leonhart, Inc. This employment continued through May of 1960. In June Bill left Baltimore on a pleasure trip to Europe. His salary for the 5 months of January through May was allowed by respondent as a salary deduction to Leonhart, Inc. In the fall of 1960 Bill enrolled at American University in Washington, D.C., where his principal field of study was classical guitar. Bill had previously *226 attended the Institute of Languages and Linguistics of Georgetown University in Washington, D.C., from the fall of 1958 until the fall of 1959. While Bill was studying music at American University Harold wrote him a letter dated September 23, 1960, parts of which follow: Dear Bill,… 2. A Research Program in Reinsurance is essential to me and will involve: A. Translating the German Dictionary, if it has not already been translated. (You can ascertain whether it has been done and whether the English translation is available.) B. Studying Facultative Reinsurance with Otis Clark in San Francisco. C. Sitting in Lloyd's Box in London both Underwriting and Claims for at least three months. D. Working with Domestic Reinsurance companies, such as Christiania General, and Reinsurance Brokers, such as, Reinsurance Agency, Inc., in Chicago, and Booth, Potter and Seal, in Philadelphia, or NERCO in Boston. E. Finally, writing a book on the subject and establishing offices for LCO in various countries. 3. I am beginning to build up the Reinsurance and General Agency business for the American Fidelity and Casualty Company and the American Fidelity Fire Insurance Company of which *227 T. Coleman Andrews is President, which will necessitate my working with Reinsurance Brokers, Reinsurance Companies, and General Agents throughout the country and perhaps in other countries. Therefore, it will be very necessary that we establish immediately a Research and Development Activity which will establish LCO permanently and importantly in the Reinsurance business world-wide. 4. I am going to Los Angeles today and San Francisco Monday, returning Tuesday night, and talk to Otis Clark about the company and perhaps to send Harry Gibbs's son, Holden, to San Francisco to begin his study of Reinsurance. Holden is 28 years old and has just come out of the army and has a B.S. in Business Administration. After I return I would like for you to meet him. 5. There could also be a place for Dick Lurito in this activity and if he is interested, I will try to arrange a salary to both of you during the Study and Research period, of $200.00 per month, less Withholding Taxes and Social Security. Incidentally, I paid the note at the Union Trust which is enclosed 451 herewith. I didn't want a personal loan for such a small amount to be outstanding with the name Leonhart on it because *228 it would become common knowledge amongst all of the bank officials. McEachern should not have endorsed it but, of course, as with borrowing his car, he wouldn't say no to you, and for that reason I would appreciate your not making any requests of anyone in the organization or anyone that I know for assistance of that type or financial assistance - you can ask me. What I have proposed is most essential and will enable both you and Dick to embrace your past education and training with respect to Economics and Languages and need not necessarily interfere with the continuation of the studies in related fields. The "Dick" referred to in this letter was Richard Lurito, who was attending American University as a student in the fall of 1960 and was rooming with Bill. He was paid by Leonhart, Inc., $200 per month during the fall of 1960 and the first part of 1961 to gather information relating to the feasibility of an American reinsurance company entering the Latin American market and to the laws of certain South American countries applying to the potential conduct of such a business by an American company. Richard, who had a background in languages, drew up a questionnaire in Spanish which *229 was sent to several Latin American governmental officials. The record in this case does not contain evidence of any responses to this questionnaire. The only specimens in the record of work completed by Bill are a barely legible handwritten copy of the translation into English of a book in French on reinsurance, and a translation of approximately 50 German words, many of which related to the insurance business. There is no evidence that the translations were ever utilized by Leonhart, Inc., for any purpose. Payments of "salary" to Bill were made by Leonhart, Inc., during 1960 and 1961 as follows: 1960
1961
Date
Check #
Amount
Date
Check #
Amount
1/12
2006
$ 100.00
1/14
U1264
$ 100.00
1/27
2047
100.00
1/30
U1280
100.00
2/11
2091
100.00
2/15
U1291
100.00
2/25
2109
100.00
2/28
U1305
100.00
3/11
2172
100.00
3/15
U1319
100.00
3/26
2249
100.00
3/31
U1335
100.00
4/9
2274
100.00
4/15
U1353
100.00
4/26
2338
100.00
4/28
U1386
100.00
5/12
2398
100.00
5/12
U1408
100.00
5/25
2440
100.00
5/24
U1423
100.00
9/23
U1137
100.00
6/15
U1462
100.00
10/15
U1163
100.00
6/30
U1475
100.00
10/25
U1184
100.00
7/14
U1496
100.00
11/15
U1199
100.00
7/31
U1508
100.00
11/30
U1218
100.00
8/15
U1516
100.00
12/15
U1233
100.00
8/31
U1529
100.00
12/30
U1260
100.00
9/15
U1540
100.00
$1,700.00
9/22
U1547
100.00
10/17
U1584
100.00
10/30
U1590
100.00
11/13
U1615
100.00
11/27
U1637
100.00
12/11
U1648
100.00
12/26
U1659
100.00
$2,500.00
*230 In connection with the work to be done by Bill for which these "salary" payments were made, Bill wrote the following letter to Harold: Dear Dad: Since I am not merely translating this book as a personal favor to you or for my own edification but as part of a project, for which you are responsible to the Internal Revenue, I would like to suggest a probable course of action. I would prefer to work on the transaction and present it to you as a component of Dick's work, not merely as an interesting book. That is, I would rather have you cease payment and consider, when the job is done, whether or not you still cherish the whole idea or not. If you do, then you could arrange adequate compensation for it. In the meantime I keep my own record of hours spent on the work. My knowledge of your situation with the Internal Revenue is very limited, nor do I know whether I have conveyed my suggestion properly in terms of a feasible solution to the present situation. If not, I will confer with you anytime which is convenient for you. Bill Both Bill and Jay held membership cards in a musicians' union in the years in question. They occasionally played their musical instruments before customers *231 of Leonhart, Inc., in 1960 and 1961 at the request of their father. In 1960 and 1961 neither Bill nor Jay had made a career choice, but both were considering becoming professional musicians. Harold was interested in having both enter the reinsurance business. In 1964 both decided to do so and have been with Leonhart, Inc., since that time. Ultimate Finding of Fact Relating to Issue 4 Petitioners have failed to establish that any amounts in addition to those allowed 452 by respondent designated as "salary" of Bill or Jay were ordinary and necessary business expenses of Leonhart, Inc., or that Leonhart, Inc., had an actual or apparent liability for the employment taxes paid relating to the contested salary payments. Additional Findings of Fact Relating to Issue 5 In 1960 petitioners claimed $18,587.57 as deductions on account of advertising expenses of Leonhart, Inc. Of this amount the respondent disallowed $708.05 representing expenses incurred by Leonhart, Inc., related to the publication of a biography of Dr. Courtney W. Shropshire. This book, entitled The Fabulous Octogenarian, was written by Harold's brother, James C. Leonhart. Dr. Shropshire, or "Dr. Shrop" as *232 he is referred to in the book, was the founder of the Civitan Club International, a service organization of which Harold was a member. James Leonhart had been an English teacher but retired in order to complete the book. Harold was a close friend of "Dr. Shrop" and had worked with him when Harold was the director of the Red Cross blood program in Baltimore. No mention is made of Harold's business in that part of the book introduced into evidence herein as petitioners' Exhibit 170 with the exception of one reference to transactions of Harold with Lloyd's of London. Harold is mentioned frequently in Exhibit 170 but the name of Leonhart, Inc., appears only once, in the reproduction of the letterhead of a letter from Harold to "Dr. Shrop." No evidence was adduced as to the nature or extent of the distribution of the book except Harold's statement that "it was distributed throughout the country." Ultimate Findings of Fact Relating to Issue 5 Petitioners have not shown that the expenses relating to the Shropshire biography were deductible business expenses of Leonhart, Inc. Additional Findings of Fact Relating to Issue 6 Leonhart, Inc., claimed deductions of expenses and depreciation *233 on equipment in connection with the "Leonhart Music Club" in the following amounts, all of which were disallowed: Year
Expenses
Depreciation
1960
$ 1.82
$760.89
1961
$755.42
$901.44
From 1953 until the years in question Leonhart, Inc., carried on its books an asset account designated "Music Club Equipment." By the end of 1961 the total cost of the equipment assigned to this account was $10,350.71. Among the items carried on this account up through 1960 were 2 pianos, an electric player piano, 2 ukeleles, a variety of banjos and guitars, a recording instrument, a record player and a radio. In 1961 there was added equipment in the amount of $2,672.95, including among other things two flutes, a base [bass] fiddle, two guitars and a bass. Items in this account were depreciated on a straight-line basis, all items being assigned a useful life of ten years. Of the claimed deduction for "Music Club" expenses in 1961 petitioners have conceded that an item of $268.50, representing the expense of music lessons for Jeanne, Valerie, and John are not deductible. Harold's entire family was interested in music and all eight members played instruments. Bill and Jay *234 were professional musicians in 1960 and 1961 and were members of a musicians' union. They both were considering music as a career at that time. Bill received $12 to $14 per hour for performing as a professional musician at various functions in 1960 and 1961. Jay played with a professional orchestra during the summer of 1961. The only evidence of any income of Leonhart, Inc., attributable to the Music Club is a bank deposit slip in the amount of $100 dated September 14, 1961, stating "RECEIVED FROM WILLIAM H. LEONHART, II, CREDIT TO L CO * * * MUSIC CLUB ACCOUNT INCOME - PERFORMANCE FEE." Bill and Jay occasionally played musical instruments for the purported entertainment of customers of Leonhart, Inc. Ultimate Findings of Fact Relating to Issue 6 Petitioners have failed to prove that the expenses and depreciation related to the "Leonhart Music Club" constitute proper deductions of Leonhart, Inc., for the taxable years 1960 and 1961 and that respondent erred in disallowing them. 453 Additional Findings of Fact Relating to Issue 7 Leonhart, Inc., claimed deductions for depreciation and maintenance expenses in connection with several automobiles, the titles to most *235 of which were held in its name. With regard to some of these automobiles respondent disallowed parts or all of the claimed deductions. As to these petitioners allege that most of the automobiles were used in the business of the corporation and that the use of other automobiles by certain employees of the corporation for personal purposes constituted "fringe benefits" paid to such employees. Leonhart, Inc., depreciated all of the automobiles on a straight-line basis, assigning to some a three and others a four year useful life. The entire amount of the depreciation and the maintenance expenses was deducted by Leonhart, Inc., with no allocation of any part thereof to any other person on account of personal use. The claimed depreciation items and those disallowed by respondent are as follows: Cost less
salvage
Date
Life
Auto
value
Acquired
(Years)
(1) 1957 Chevrolet
* $2730.38
7/23/57
4
(2) 1958 Olds
* 3584.50
1958
4
(3) 1958 Chrysler Imp
* 7247.00
1958
4
(4) 1957 Cadillac
* 4743.00
1958
4
(5) 1959 Cadillac
4730.00
3/24/60
3
(6) 1960 Ford Falcon
1948.11
9/60
4
(7) 1960 Cadillac
4911.00
2/27/61
3
(8) 1959 Jaguar
2700.00
6/20/61
3
(9) 1961 Ford Falcon
2013.57
4/3/61
4
Total
*236 1960
1961
Depr.
Depr.
Depr.
Depr.
Auto
claimed
allowed
claimed
allowed
(1) 1957 Chevrolet
$ 682.58
$ 0
$ 341.35
$ 0
(2) 1958 Olds
896.12
0
896.12
0
(3) 1958 Chrysler Imp
1811.75
1521.72
1811.75
1521.72
(4) 1957 Cadillac
592.87
0
592.87
0
(5) 1959 Cadillac
788.34 788.34
788.34
788.34
(1/2 yr.)
(1/2 yr.)
(1/2 yr.)
(1/2 yr.)
(6) 1960 Ford Falcon
243.52
243.52
487.04
487.04
(1/2 yr.)
(1/2 yr.)
(7) 1960 Cadillac
0
0
818.50
818.50
(1/2 yr.)
(1/2 yr.)
(8) 1959 Jaguar
0
0
450.00
0
(1/2 yr.)
(9) 1961 Ford Falcon
0
0
251.69
0
Total
$5015.18
$2553.58
$5844.79
$3615.60
In explaining his adjustments to the amounts claimed as depreciation deductions respondent in schedules attached *237 to his notice of deficiency stated that the automobiles for which no depreciation was allowed, other than the 1957 Chevrolet, were "considered personal and not business items," [2] that the 1957 Chevrolet was "determined to be used 25% for business, therefore, asset is fully depreciated" (since petitioners had accumulated depreciation of $1,706.45 on that item in prior years), and that the salvage value of the 1958 Chrysler Imperial was increased from zero to $725. Leonhart, Inc., also claimed as a deduction "automobile expense" which included expenditures for repairs. The total amount spent for such repairs, the allocations thereof to the particular automobiles and the respondent's allowance or disallowance thereof, are as follows: [3]
*238 454 REPAIRS
1960
1961
Description
Claimed
Allowed
Claimed
Allowed
1. 1953 Jaguar
$442.66
$ 0
$ 570.71
$ 0
2. 1958 Chrysler Imperial
329.21
317.24
1272.65
1261.15
3. 1953 Oldsmobile
120.48
0
0
0
4. 1958 Oldsmobile S.W.
712.75
0
852.41
0
5. 1960 Volvo
68.50
0
179.54
0
6. 1957 Chevrolet
136.48
34.12
197.38
49.35
7. 1959 Cadillac
121.43
0
0
0
8. 1951 Ford
6.50
0
377.54
0
9. 1957 Cadillac
0
0
0
0
10. 1959 Jaguar
0
0
116.72
0
11. 1961 Ford Falcon
0
0
62.28
0
12. 1958 Ford
0
0
26.80
0
Total
$1938.01
$351.36
$3656.03
$1310.50
In addition to the claimed deduction for repairs in 1960 certain amounts were expended for gas, oil, tires and license plates and were included in the deduction claimed as "automobile expense." Of a total of $1,625.22 claimed on account of those expenses, the respondent allowed $10.97 representing gasoline purchased by Harold ($8.95) and an employee of Leonhart, Inc. ($2.02), and $18.48 apparently representing the cost of tires, neither item being allocated to any particular automobile. The following expenditures on account of gas, oil, tires and license *239 plates in a total amount of $1,568.99 were disallowed by respondent for 1960: (1) $731.22 representing purchases of gasoline paid for by Leonhart, Inc., but not identified as to a particular car or purchaser; (2) $165.61 representing an expenditure only explained as having been made by "W.H.L. Agent" and not related to any particular car or cars; (3) $91.50 representing expenditures for licenses for the 1953 Jaguar, 1958 Olds, 1960 Volvo, 1953 Olds, and 1958 Ford; and (4) expenditures for gasoline, tires, and oil shown as purchased by the following individuals in the following amounts but without any showing of the particular automobile for which the expenditure was made: Bill
$ 30.27
Martha
51.06
Jay
119.75
John
274.77
Jeanne
104.21
$580.66 The record does not explain the discrepancy of $26.78 between the total amount of the deductions claimed as expenditures for gas, oil, tires and license plates in 1960 and the total of the specific items allowed and disallowed which appear in the exhibits which are in evidence. In addition, Leonhart, Inc., claimed deductions in 1960 in the amount of $176.51 on account of a loss on the sale of a 1957 Cadillac which *240 was driven primarily by Martha, and in the amount of $50 expended by it to cover Bill's traveling expenses to New York and return, incident to his picking up a Jaguar automobile from a repair shop in New York and returning it to Baltimore. In addition to the claimed deduction for repairs in 1961, certain other amounts were included in the deduction claimed as "automobile expense." Of a total amount of $553.78 claimed on account of those expenses respondent allowed a deduction of $44.37 representing expenditures for oil and gas made by Harold not allocated to any given automobile. The following amounts expended in 1961 by the following persons for oil and gasoline, not allocated to any given automobile, were disallowed by respondent: Jeanne
$ 34.90
Jay
31.20
John
112.36
Bill
2.50
Martha
23.74
$204.70 Respondent also disallowed deductions for the following expenditures made by or on behalf of Leonhart, Inc.: (1) $157.50 expended for car rental; (2) $10 paid for automobile paint, and (3) $126.72 paid to a "Downtown Garage" for storage and gas. The remaining amount of $10.49 in the total claimed deduction on account of "automobile expense" apparently represents *241 claimed expenses of Leonhart, Inc., on account of 455 "Gas, Oil, Tires, Etc." but is not further explained or substantiated by the record. [4]
In 1960 and 1961 Harold expended $58.83 and $374.76 respectively for gas and oil, which amounts were credited to his personal account by Leonhart, Inc., and for which no deduction has been claimed. All of the automobiles owned and operated by Harold or Leonhart, Inc., were insured at a "business" rather than a "personal" rate by Fowler, Leonhart and Associates, Inc., an agency in which Harold had an ownership interest in 1960 and 1961. The 1957 Chevrolet was used to some extent for business by Margaret Sands, Harold's secretary and an officer of Leonhart, Inc. It was also used by her with the consent of Leonhart, Inc., for commuting to and from work and for other personal purposes. The use of this automobile by Margaret in 1960 and 1961 constituted one half the use of this *242 automobile for those years. Leonhart, Inc., permitted this use of the 1957 Chevrolet by Margaret for the purpose of either improving employee relations or supplementing cash compensation or for both reasons. The 1951 Ford was driven by Mrs. Lindsay, an employee of Leonhart, Inc., to an extent and for purposes not disclosed by the record. The 1959 Cadillac was kept in Florida and used by Harold when he was in Orlando on business. It was also used by officers of the American Fire and Casualty Co. Petitioners have not established that any of the automobiles other than the 1958 Chrysler Imperial, the 1959 Cadillac and the 1957 Chevrolet were used by Harold or other employees of Leonhart, Inc., in the business of Leonhart, Inc. Martha, Jeanne, John, Bill and Jay all operated some of the automobiles at various times during the years in question. Martha, Jeanne and John were not employed by Harold or Leonhart, Inc., during the taxable years. The facts relating to the employment of Bill and Jay are set out, supra, under Issue 4. Harold regularly drove to and from work, a distance of about six or eight miles each way. In the summer months the Leonhart family regularly lived at "Sherwood *243 Forest" which was located about 24 miles from their residence in Baltimore. Harold would usually drive to Sherwood Forest twice each week in the summer except when he was absent from the Baltimore area. Ultimate Findings of Fact Relating to Issue 7 Petitioners are not entitled to deduct any loss claimed on account of the disposition of the 1957 Cadillac or to deduct any expense incident to the return of a Jaguar from New York to Baltimore. Expenses of maintenance and repair relating to the 1957 Chevrolet are deductible business expenses of Leonhart, Inc., to the extent of 50% of the amounts claimed for those items. The expense of the repairs to the 1959 Cadillac claimed for 1960 is a deductible business expense of Leonhart, Inc. No other deductions on account of automobile expense or depreciation charges with regard to automobiles owned by Leonhart, Inc., or petitioners or members of petitioners' family in excess of those allowed by respondent are properly allowable. Additional Findings of Fact Relating to Issue 8 In 1961 Leonhart, Inc., made a payment of $1,500 to the Baltimore law firm of Cross and Shriver. Of this amount, all of which was claimed as a deduction by *244 Leonhart, Inc., respondent disallowed $1,200. A copy of a voucher relating to this payment read "For the account of W. Harold Leonhart, Leonhart and Co., Inc., Leonhart and Co. (Md.), Inc., and Southern Underwriters, Inc." No statement from the law firm indicating the nature of the services performed for which the payment was made could be located in the records of either Leonhart, Inc., or the law firm. A "time sheet" from the files of Cross and Shriver indicated that certain matters relating to Harold personally as well as some business matters not identified as to corporation remained unbilled as of December 31, 1961. Ultimate Findings of Fact Relating to Issue 8 Petitioners have failed to prove that Leonhart, Inc., is entitled to a deduction with respect to this payment in addition to that allowed by respondent. 456 Additional Findings of Fact Relating to Issue 9 On its returns for 1960 and 1961 Leonhart, Inc., claimed travel and entertainment expense deductions in the amounts of $43,677.96 and $25,999.93 respectively. Of these amounts the respondent in his notice of deficiency disallowed $12,385.25 for 1960 and $2,053.49 for 1961. In an amendment to their *245 petition petitioners claimed additional deductions for business expenses of Harold in 1961 for amounts alleged to have been paid by Harold and not reimbursed to him by Leonhart, Inc., or any other corporation. A total of $4,090.63 of additional deductions claimed in petitioners' amended petition for travel and entertainment expenses remains in dispute. Among the individual items involved in this issue are claimed deductions relating to the following: (1) a South American tour; (2) The American Fire and Casualty Company; (3) the Merchants Club; (4) expense of Martha and the wife of a business associate of Harold on a trip to London in 1960; (5) travel expenses of Martha; (6) liquor purchases; (7) rare books; (8) Diner's Club; (9) Nassau and Miami trip; (10) flowers; (11) F.B.I. "Steak-Out"; (12) traveler's checks; (13) the University Club of Orlando, and (14) alleged business expenses of Harold paid by him for which he was not reimbursed. South American Tour In 1960 Harold participated in a "trade tour" of South America sponsored by the Maryland Port Authority. The parties agree that his travel expenses on this trip, which were paid by Leonhart, Inc., amounted to $2,399.50. The *246 respondent disallowed the deduction of the entire amount. The stated purpose of the tour was to stimulate the business of the Port of Baltimore and of Maryland generally. Of the 20 Maryland businessmen and 8 officials of the Port Authority who participated in the tour, Harold was the only person engaged in the insurance business. The 25-day tour itinerary called for business conferences, plant inspections, harbor tours and receptions in Puerto Rico, Venezuela, Brazil, Argentina, Chile, Peru and Columbia. Harold had some interest in exploring the possibility of expanding his reinsurance business into South America, particularly into Colombia. After the tour Leonhart, Inc., did no reinsurance business in South America although Harold made a subsequent trip to Bogota, Colombia, and maintained an interest in the possibility of carrying on a reinsurance business in South America. See findings relating to Issue 4, supra. Leonhart, Inc., took out at its own expense and on Harold's initiative a group accident policy with Mutual of Omaha extending insurance protection to all of the participants of the tour while airborne. Under this policy the estate of each participant would receive $75,000 *247 upon his accidental death. The cost of this coverage to Leonhart, Inc., was around $115. No business was acquired by Leonhart, Inc., directly as a result of the tour. Sometime after the tour the Baltimore Airport increased the insurance it carried with Mutual of Omaha from $7,000,000 to $15,000,000. As a result Mutual of Omaha purchased additional reinsurance through Leonhart, Inc. At that time the chairman of the Airport Commission was Charles Crane, who had been the chairman of the tour. In 1964 and again in 1966, Leonhart, Inc., procured accident insurance covering members of other tour groups sponsored by the Maryland Port Authority, the sponsor of the 1960 South American tour. In 1966 Leonhart also procured trip baggage insurance for tour members. The total commission on these policies received by Leonhart, Inc., did not exceed $335. In 1965 Leonhart, Inc., procured two "group trip personal accident insurance" policies for the Baltimore Gas and Electric Company. Leonhart, Inc.'s commission on these policies was undisclosed by the record. Charles Crane was chairman of the board of the Baltimore Gas and Electric Company in 1960. The record does not disclose whether he was *248 associated with that company in this or any other capacity in 1965. In 1962 Leonhart, Inc., acquired for the City of Baltimore from Lloyd's underwriters a five year fire and lightning insurance policy on which Leonhart, Inc., received a substantial commission. Expenses Relating to the American Fire and Casualty Company The respondent disallowed a deduction claimed by Leonhart, Inc., for 1960 in the amount of $1,200 representing rental payments for the months of January, February, 457 March and April, for a fishing cottage in Florida known as Englewood Lodge. This cottage was owned by two officials of the American Fire and Casualty Co. Harold informed one of the co-owners, Charles Hagar, vice president of American Fire, that he (Hagar) could invite anyone he wanted to the cottage as long as the person invited was a client or prospective client of Leonhart, Inc., or American Fire. American Fire, a substantial client of Leonhart, Inc., had an office in Orlando, Florida, which is in the same general area as the cottage. Harold used the cottage himself twice when on business in Orlando. The cottage was also used by various officials of American Fire and other insurance men. Leonhart, *249 Inc., did not rent the cottage after 1960 because Harold felt it was not getting enough use. On April 2, 1960, Harold entertained officers and wives of officers of American Fire and the American Independent Reinsurance Co. at the Villa Nova Restaurant in Winter Park, Florida, on the occasion of the 33rd anniversary of the founding of American Fire. The cost of the party was $859.31, all of which was claimed as a deduction and disallowed by the respondent. In 1960 Leonhart, Inc., paid $843.40 to the Villa Nova Restaurant for packaged liquor which was given to officials of American Fire as Christmas gifts. The respondent disallowed a deduction claimed for this amount. Leonhart, Inc., received a large amount of commission income in 1960 on reinsurance purchased by American Fire. See additional findings of fact relating to Issue 3, supra. Merchants Club Respondent disallowed a deduction by Leonhart, Inc., of $38.91 paid by it in 1960 to the Merchants Club in Baltimore in connection with the entertainment of Thomas F. McNulty, Ernest F. Fink, and Walter Peppersack. The Merchants Club is a businessmen's luncheon club. McNulty was then the president of a Baltimore radio station *250 and was at some prior time chairman of the Maryland State Liquor Board. Fink held a Steinway piano dealership in Baltimore. Peppersack was in 1960 the warden of the State Penitentiary at Baltimore. Expenses of Martha and Wife of Business Associate on Trip to London in 1960 Leonhart, Inc., claimed $5,676.56 as a deduction for the cost of a trip to London taken by Harold, Donald M. Madgett, vice president of Mutual of Omaha, and their wives in 1960. Mutual of Omaha employed Leonhart, Inc., as its broker in the purchase of reinsurance. Much of this reinsurance was obtained through Lloyd's. The principal purpose of the trip to London was to introduce Madgett, who was in charge of reinsurance for Mutual of Omaha, to the Lloyd's underwriters with whom Harold did business. Respondent disallowed this claimed deduction to the extent of $2,806.63, which represented the expenses of the trip relating to the wives of Harold and Madgett. Of the total amount claimed, $189.90 [5] represented railroad fares and expenses from Baltimore to New York for Harold and Martha, the Madgetts, and Mr. and Mrs. John D.C. Roane. The respondent disallowed one-third of this amount, or $63.30, as expenses relating *251 to Martha and Mrs. Madgett. Donald Madgett paid Harold $750 as reimbursement to Leonhart, Inc., of a portion of the expenses of his wife, for which he (Madgett) was not reimbursed by Mutual of Omaha. Neither wife had any specific business function and played no part in the transaction of business during the day. Rather, they would spend the day shopping or sightseeing. After the men finished their business of the day they would be joined for dinner by their wives. Frequently petitioners and the Madgetts would have as their guests at dinner English insurance men and their wives. As a vice president of Mutual of Omaha, Donald Madgett was in *252 a position to participate in the determining of which reinsurance broker would be utilized in procuring reinsurance for his compan8. In the years 1960 through 1963 Leonhart, Inc., received commission income on business transacted between Mutual of Omaha and Lloyd's in the amounts of $15,545, $25,179, $27,980, and $13,434, respectively. 458 Travel Expenses of Martha In 1960 Leonhart, Inc., paid a hotel bill in the amount of $31.90 to the John Marshall Hotel in Richmond, Virginia, for expenses incurred by Harold and Martha on September 20, 1960. Harold was in Richmond to make a speech at a Red Cross meeting. In 1961 Leonhart, Inc., paid hotel bills of $244.21 to the Mark Hopkins Hotel in San Francisco and $68.32 to the Astor Hotel in New York City. These sums represented the cost of hotel accommodations for Harold and Martha. On the New York visit Harold met with Joseph Hadley, a Lloyd's broker, and George Bradshaw, a vice president of American Fire and Casualty Co. In San Francisco Harold met with Otis Clark, who was successfully engaged in the insurance business on his own account and was also an officer of Leonhart, Inc., during part of 1961. On both trips the men with *253 whom Harold conferred were accompanied by their wives. The respondent disallowed petitioners' claimed deductions with respect to these amounts (i.e., the amounts spent in Richmond, San Francisco and New York) to the extent of $15.90, $122.11, and $34.16, representing the portion of the costs applicable to Martha. The respondent disallowed a deduction claimed for 1960 in the amount of $27.92 paid by Leonhart, Inc., to the Pennsylvania Railroad. On October 7, 1960, Leonhart, Inc., purchased three round-trip rail tickets between Baltimore and New York at a cost of $27.92 each. Two of the Baltimore to New York portions of the tickets were used by Harold and Martha on October 9, 1960, according to an expense account memorandum for that day kept by Harold. Two of the three return trips to Baltimore were used on October 26. A rail travel order issued by the Pennsylvania Railroad indicated that the passengers were "Mr. and Mrs. W. Harold Leonhart." Harold's expense account memorandum book indicated that a business associate, David Douetil, also accompanied him from New York to Baltimore on October 26. The $27.92 amount disallowed by the respondent represented the cost of a roundtrip *254 ticket for Martha between Baltimore and New York. Liquor Purchases In 1960 and 1961 respondent disallowed deductions claimed by Leonhart, Inc., for liquor purchases in the amounts of $343.13 and $621.41 respectively. Respondent concedes that the amounts claimed were expended by Leonhart, Inc. The liquor so purchased was consumed on the premises occupied by Leonhart, Inc., and also by Leonhart and Co. of Maryland and Southern Underwriters. [6]
Rare Books Respondent disallowed a deduction claimed by Leonhart, Inc., for 1960 in the amount of $411 representing the cost of a first edition of Dr. Samuel Johnson's Dictionary and a first edition of Boswell's Life of Johnson. The two books were purchased by Harold at the Clark Hall Bookshop in London in September of 1960. The books were brought to Baltimore and kept in the offices of Leonhart, Inc. Harold believed the books would be of interest to business associates and clients, particularly those from England. As "conversation pieces" the books had an indeterminate useful life in excess of one year. Harold did not have a collection of rare books at home. Harold kept *255 the books until 1966, at which time he gave them to an educational institution. The books were then worth more than $411. Diners' Club The respondent disallowed deductions claimed by Leonhart, Inc., of $65.74 and $193.22, representing amounts paid by it to the Diners' Club in February and March of 1960. These obligations were incurred in the first instance by Harold's son Bill on the dates and to the payees as follows: Paid in February
Date
Location
Amount
Dec. 14, 1959
Chesapeake Inn, Annapolis, Md
$ 22.32
Jan. 6, 1960
Hertz Co., Miami, Fla
31.04
Jan. 12, 1960
Taylor House, Towson, Md
12.38
Total
$ 65.74
Paid in March
Date
Location
Amount
Dec. 4, 1959
New York City (restaurant)
$ 22.63
Dec. 5, 1959
Keen's Chop House, New York City
24.89
Dec. 6, 1959
Brass Rail, New York City
14.86
Dec. 8, 1959
Normandy Farm Inn, Rockville, Md
20.53
Dec. 10, 1959
Charcoal Pit Restaurant, Washington, D.C.
5.59
Dec. 13, 1959
Peerce's Plantation, Inc., Phoenix, Mo
6.24
Dec. 15, 1959
C.S. Hammond & Co., Maplewood, N.J.
13.00
Dec. 19, 1959
The Mt. Vernon, Fayetteville, N.C.
10.30
Dec. 21, 1959
L'Auberge, Inc., Orlando, Fla
18.35
Dec. 22, 1959
Gifford Arms, Orlando, Fla
47.56
Undisclosed
Undisclosed
9.27
Total
$193.22
*256 At some time during the fall of 1959 Bill attended an insurance training school operated by the American Fire and Casualty Co. in Orlando, Florida. He became a fulltime employee of Leonhart, Inc., in January 1960 and continued in that capacity through May 1960. Nassau and Miami Trip In 1960 Leonhart, Inc., claimed a deduction for $292.72 paid to American Airlines. Of this amount $27.50, representing the amount of the fare from Boston to Baltimore of an employee of Leonhart, Inc., was allowed as a deduction. Of the remaining $265.22, [7] which related to a trip to Nassau taken by all eight members of the Leonhart family in December of 1959, including Harold, respondent allowed 1/9 or $29.47 as a deduction. Harold transacted business with two insurance companies while in Nassau, although the trip was purely personal as to the members of Harold's family. After leaving Nassau in the first week of January 1960, Harold and his family flew to Miami *257 where they stayed for a few days at the DuPont Plaza Hotel. The total cost of their stay was $440.20. Of this amount paid by Leonhart, Inc., and claimed as a deduction, respondent disallowed $356.98. The record does not disclose whether all of the Leonhart family stayed at the hotel Harold transacted some business while in Miami In addition Leonhart, Inc., paid the sum of $15.47 on account of an automobile rented in Miami by Bill. The use to which the auto was put is not disclosed by the record. This amount was claimed by Leonhart, Inc., as a deduction and disallowed by the respondent. Flowers In 1960 Leonhart, Inc., paid $10.30 for flowers sent to the wife of Thomas McNulty when she was in the hospital. McNulty was president of a Baltimore radio station in 1960 and was not connected with the insurance business. In that year Leonhart, Inc., paid a total of $33.52 to Earle Kirkley, Inc., for flowers. Of this amount $15.46 was for flowers designated "Leonhart" on the invoice, $15.46 for flowers designated "Hayes" and "Porter" on the invoice, and an undesignated $1.60 telegram charge. Porter and Hayes were officers of American Fire and Casualty Company. On another occasion *258 in 1960 Leonhart, Inc., expended $3.50 for flowers for the wife of Charles P. Crane, the chairman of the Baltimore Gas and Electric Company referred to, supra, in connection with the South American tour. All of these amounts were claimed as deductions by Leonhart, Inc., and disallowed by the respondent. F.B.I. "Steak-Out" In 1961 Leonhart, Inc., paid $10 for two tickets to a "steak-out" or cook-out sponsored by the Federal Bureau of Investigation. A deduction claimed for this amount was disallowed by the respondent. An F.B.I. agent had at some prior time aided in some way in the establishment of the salvage value of stolen furs which had been recovered and which had been insured against loss by theft by an insurance policy written through Leonhart, Inc. Traveler's Checks In 1961 Leonhart, Inc., made certain payments on account of the travel expenses of 460 James O. Honeywell incident to a trip to London taken by him and Harold in this year. Honeywell was an officer of the New Amsterdam Insurance Company. Before they left for London, Honeywell reimbursed Leonhart, Inc., to the extent of $875.58. Harold used the reimbursement check of Honeywell for purchasing traveler's *259 checks in his own name in the amount of $800 and kept the remainder of $75.58 in cash. The traveler's checks were cashed by Harold while in Europe, principally in hotels and banks. No evidence was introduced relating to the persons or purposes to whom or for which Harold paid the proceeds of these checks or the $75.58 in cash. Of the payments made by Leonhart, Inc., in connection with this trip respondent disallowed the sum of $889.38 related to the expenses of Honeywell. Petitioners continue to claim that the entire amount of $889.38 disallowed by respondent is deductible by Leonhart, Inc., as an ordinary and necessary business expense for 1961. Petitioners on brief claim in the alternative that Leonhart, Inc., is entitled to deduct the $875.58 as travel expenses of Harold. The University Club of Orlando In 1961 Leonhart, Inc., paid to the University Club of Orlando, Florida, the amount of $11.02 for expenses incurred by Harold on February 24, 1961, for two massages totaling $8.06, and two bar checks totaling $2.96. On this occasion, Harold was in the company of a mannamed Michael Wheeler of London,England, who was a business acquaintance of Harold. Harold frequently took *260 massages because of "certain ailments" which he had, including an arthritic shoulder and hip. The record does not disclose what business, if any, was discussed by Harold and Wheeler on this occasion. Unreimbursed Expenses In an amendment to their petition, petitioners claimed deductions for 1961 for business expenses of Leonhart, Inc., not previously claimed, paid for by Harold in 1961 but not reimbursed by Leonhart, Inc., or any other corporation. Respondent does not contend that any of the sums claimed were not actually paid by Harold, and we find that all of the amounts so claimed were paid. Of the amounts claimed, the following items in even dollar amounts represent checks cashed by Harold at the following hotels: DATE
PAYEE
AMOUNT
5/15/61
@WHL (cashed by Hotel Mark Hopkins)
$ 200.00
2/14/61
Barclay Hotel
100.00
3/11/61
Golden Strand Hotel & Villa
100.00
3/27/61
Hotel Emerson
50.00
3/13/61
Cherry Plaza Hotel
200.00
5/ 1/61
GoldenStrand
200.00
5/10/61
Hotel Emerson
100.00
5/14/61
Chapman Park Hotel
100.00
5/28/61
Hotel Sheraton Belvedere
60.00
6/30/61
Hotel Warwick
100.00
6/ 4/61
Hotel Bellevue - Stratford
15.00
9/13/61
Canfield Hotel
50.00
9/13/61
Hotel Canfield
50.00
9/17/61
Hotel Chapman Park
50.00
9/29/61
Hotel Emerson
100.00
10/ 9/61
Hotel Emerson
50.00
11/26/61
Hotel Emerson
200.00
12/ 2/61
Chapman Park Hotel
200.00
12/27/61
Hotel Biltmore
200.00
12/29/61
Hotel Biltmore
200.00
Total
$2,325.00
*261 The purposes for which the proceeds of these checks were spent are not disclosed by the record before us. Additional amounts claimed which remain in dispute follow: DATE
PAYEE
AMOUNT
2/ 9/61
The Evergreen Annual
$ 25.00
5/ 4/61
Mecca Restaurant
7.51
9/ 7/61
International Playboy Club
50.00
2/23/61
University Club of Orlando
120.00
2/25/61
Swetman Travel Service
137.51
5/17/61
Chapman Park Hotel, Los Angeles
295.60
5/ 1/61
The Golden Strand - Miami
132.60
5/ 3/61
The Golden Strand - Miami
116.02
3/12/61
The Golden Strand - Miami
20.03
10/19/61
Berger A. Gustafson
300.00
12/ 9/61
Fairmont Hotel - San Francisco
288.15
12/29/61
Biltmore Hotel - New York (1/6 $539of.25)
89.87
1/10/61
Sheraton Belvedere Hotel
183.34
Total
$1,765.63
On February 9, 1961, Harold drew a check for $25 to the order of The Evergreen Annual, a Loyola College (Maryland) yearbook. This was in payment for a business advertisement relating to Leonhart, Inc., although the check bore the notation "contribution." The only evidence in the record relating to the Mecca Restaurant item of $7.51 is Harold's unsupported statement that "Mecca Restaurant would *262 be luncheon or something of that sort, nearby the office." While Harold was in Chicago at some undisclosed time he was taken by a business associate to the International Playboy Club. On that occasion Harold purchased a membership in the club at a cost of $50. 461 Harold paid $120 to the University Club of Orlando on February 23, 1961, for membership for Harold in the club. This payment was made by a check drawn on the joint bank account of petitioners and signed by Harold, with the notation thereon "membership." Harold paid $137.51 to the Swetman Travel Service of Winter Park, Florida, on February 25, 1961, representing the cost of transportation from Orlando, Florida, to Baltimore of Harold and Michael Wheeler of London,England, with whom Harold had a business acquaintance. Harold was in Florida at the time on business. The record does not disclose the business purpose, if any, of Harold's sojourns at the Chapman Park Hotel - Los Angeles, [8] the Golden Strand - Miami, Fairmont Hotel - San Francisco, Biltmore Hotel - New York and Sheraton Belvedere Hotel in connection with which the expenditures listed above were made. *263 By a check dated October 19, 1961, Harold paid $300 to Berger A. Gustafson, a masseur at the Golden Strand Hotel in Orlando, for massages for himself and others not identified by this record. Findings of Fact Relating to Issue 10 In 1960 and 1961 Harold expended amounts totaling $275.57 and $1,155.67 respectively for liquor which was consumed at the Leonhart home and for which he was not reimbursed by Leonhart, Inc., or any other corporation. At least one half of these amounts constituted expenditures by Harold for business entertainment. In 1961 petitioners made a payment of $50 to "St. Mary's Building Fund," which constituted a payment to an organization qualifying under section 170, I.R.C. 1954. Harold made cash contributions to a church totaling $200 in each of the years 1960 and 1961. None of these items were claimed as deductions by petitioners in their returns for the years 1960 and 1961. In an amendment to their petition petitioners allege that "[the] Commissioner erred in failing to allow petitioners additional deductions not claimed in their 1960 and 1961 individual income tax returns representing unreimbursed business expenses and unclaimed *264 charitable contributions, and in particular he erred in failing to allow petitioners additional deductions in 1961 evidenced by checks and vouchers aggregating approximately $5,347.41." The parties entered into the following stipulation relating to the amendment to petitioners' petition: Attached hereto as Exhibit 123 is a summary showing additional amounts claimed by Petitioners as contributions and unreimbursed business expenses in 1961, and which Petitioners claim were not deducted by them on their 1961 income tax returns and further claim were not reimbursed to them by the company." The exhibit referred to contained no reference to the liquor purchases, the payment to "St. Mary's Building Fund," or cash contributions to any church. Additional Findings of Fact Relating to Issue 11 From around 1947 through the years in question Harold maintained a summer home in a residential community known as Sherwood Forest located in Maryland about 24 miles from the Leonharts' Baltimore home. Petitioners' home in Sherwood Forest is usually open from about the first of May through Labor Day. In the summer months of 1960 and 1961 the members of Harold's family normally stayed at Sherwood *265 Forest rather than their Baltimore residence and Harold would usually travel there twice a week when he was in Baltimore. Harold was traveling outside the Baltimore area almost half the time between May 1, 1960, and September 5, 1960 (Labor Day). For that period in 1960 Harold's daily calendar makes no reference to Sherwood Forest although it contains numerous entries regarding business luncheons and other meetings with business associates. On July 1, 1956, Martha wrote a letter addressed to the "Boys and Girls" which was posted on the premises of Leonhart, Inc., extending an invitation to the employees of Leonhart, Inc., to visit at Sherwood Forest at any time through July 1, 1957. Leonhart, Inc., claimed a deduction in 1960 in the amount of $329.48 on account of maintenance expenses incurred in connection with petitioners' home at Sherwood Forest, which represented the part of such expenses 462 for which Harold was reimbursed by Leonhart, Inc. This reimbursement represented 25% of the total maintenance expenses in 1960 relating to the Sherwood Forest property, based upon Harold's judgment that the Sherwood Forest home was used at least 25% of this year for entertaining employees *266 and clients of Leonhart, Inc. These deductions were disallowed in their entirety by the respondent. 1960 was the only year for which a deduction for the maintenance expenses of Sherwood Forest was claimed by Leonhart, Inc. In addition petitioners in 1960 and 1961 claimed certain depreciation deductions relating to equipment used in connection with the Sherwood Forest property. On brief petitioners concede that the depreciation deductions claimed in these years with respect to Sherwood Forest equipment were erroneous in that the equipment had already been fully depreciated. Ultimate Findings of Fact Relating to Issue 12 Based upon the facts which we have heretofore found with respect to the other issues presented herein, we find that petitioners have failed to prove that no part of the deficiencies in the income tax of the petitioners for each of the years 1960 and 1961 was due to their negligence or intentional disregard of rules and regulations with respect to income taxes. Opinion Issue 1: Statute of Limitations Petitioners alleged in their petition that: The Commissioner erred in including in the gross income of the petitioners' additional income in the amounts *267 of $38,506.26 in 1960 and $32,212.22 in 1961, based upon adjustments in the income and deductions of an electing small business corporation not occurring or consented to within the time prescribed by section 6501(a) of the 1954 Code (made applicable by section 6037 of said Code) for the assessment of taxes imposed by reason of such adjustments. On brief petitioners further state that: The petitioners' plea of the statute is limited to corporate adjustments. The result of this partial plea in bar is to leave other disputed items relating solely to the individual returns open to assessment claims by the respondent and overpayment claims by the petitioners. The petitioners, then, make no contention that any statutory limitation of time prevents adjustments with respect to their individual returns. However, it is only with respect to their individual returns that the respondent has determined deficiencies. Leonhart, Inc., is conceded to have been an electing small business corporation under Subchapter S of the Internal Revenue Code of 1954. Where a corporation eligible to be treated as a "small business corporation" under section 1371 elects "not to be subject to the taxes imposed *268 by this chapter" (i.e., normal taxes and surtaxes) under section 1372, the amount of its undistributed taxable income (i.e., the amount of its taxable income which had not been actually distributed as dividends to its shareholders) is treated as amounts distributed as dividends and is taxable not to the corporation but to the shareholders under section 1373. Accordingly, where an eligible small business corporation makes a valid election under Subchapter S the statute contemplates that no income taxes are to be paid by it and therefore that there would be no occasion for a period of limitation on assessment and collection with respect to the corporation. It is only where the election of the corporation is for some reason determined to have been ineffective that section 6037 [9] is intended to provide that the information return filed by the corporation will be treated as a corporate return for the purposes of the statute of limitations. That is clearly indicated by that portion of the Senate Report on the Technical Amendments Act of 1958, which added section 6037, relating to that section, which reads as follows: *269 IV TECHNICAL EXPLANATION Section 68. Election of Certain Small Business Corporations * * * Annual returns required Notwithstanding the fact that an electing small-business corporation is not subject to the tax imposed by chapter 1 of the 1954 Code, such corporation must make a return for each taxable year in 463 accordance with new section 6037 as added by subsection (c) of section 68 of the bill. Such return will be considered as a return filed under section 6012 for purposes of the provisions of chapter 66, relating to limitations. Thus, for example, the period of limitation on assessment and collection of any corporation tax found to be due upon a subsequent determination that the corporation was not entitled to the benefits of subchapter S, will run from the date of filing of the return required under the new section 6037, Senate Report No. 1938, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, at 1147. Petitioners rely on cases which indicate that where a taxpayer pleads and proves facts which raise the issue of the statute of limitations the burden is on the respondent to plead and prove any exception that may apply. See, e.g., D.A. MacDonald, 17 T.C. 934. *270 Since petitioners have neither pleaded nor proved any facts which raise the issue of the statute of limitations with respect to the petitioners herein, this reliance is misplaced. We decide this issue for respondent. Issue 2: Charitable Contributions Petitioners and respondent have each conceded some of the items claimed as charitable deductions in 1960 and 1961 by petitioners on their returns for these years and in an amendment to their petition. Of the items remaining in dispute respondent contends that two should not be allowed on the ground that the question of their deductibility was raised by petitioners for the first time on brief. We shall consider these two items infra, under "Issue 10." Other than these there are three alleged charitable contributions in dispute: (1) a payment of $5 made by petitioners to the Hibernian Society in 1960, (2) a payment made to "Reverend Elbert Gay" by petitioners in 1960 in the sum of $50, and (3) a payment of $25 made by petitioners to "The Evergreen Annual." With regard to these three payments petitioners have proved that they were made to the alleged recipients in the amounts claimed. However, respondent contends that petitioners have *271 failed to prove that the recipients of the payments qualify under section 170, I.R.C. 1954, and that therefore the payments may not be deducted as charitable contributions. We have found that the payment to the Hibernian Society in 1960 of $5 was a payment to an organization qualifying under section 170, I.R.C. 1954, and therefore such payment is deductible. Petitioners have offered no evidence as to the alleged charitable contribution represented by the payment to "Revered Elbert Gay" in 1960 of $50 except testimony to the effect that a payment in this amount was made to "Reverend Elbert Gay." The name of a donee alone is not proof that the donee qualifies under section 170, I.R.C. 1954, nor is it proof of the purpose for which the payment was made. Adam Ortseifen, 14 B.T.A. 1403. This claimed deduction is therefore denied. The evidence in this case indicates that the payment to The Evergreen Annual was for a business advertisement for Leonhart, Inc., in a Loyola College (Maryland) yearbook. This amount is therefore not allowable as a charitable deduction. [10]
*272 Issue 3: Change of Method of Accounting In 1959 Leonhart, Inc., reported its commission income from American Fire and Casualty Co. on an accrual basis, and had done so since 1955, In 1960 Leonhart, Inc., elected to be taxed as a small business corporation. In its return for that year prepared and filed in 1961, Leonhart, Inc., reported this item on a cash basis, and did the same thing in its return for 1961. As a result of the change in method of accounting with regard to this item from an accrual to a cash basis Leonhart, Inc., did not report as 1960 income commissions in the amount of $14,929.08 on reinsurance secured by it for American Fire and Casualty Co. which accrued in November and December of 1960 which were not received in that year. These amounts were reported by it as 1961 income in which year they were received by it in cash. Leonhart, Inc., in January, 1961, became obligated to refund certain American Fire and Casualty Co. commissions received by it in 1960 because of a change in the reporting procedures between the primary insurer, American Fire, and the reinsurers, a syndicate of Lloyd's of London, with respect to Contract No. 4112 referred to in our findings *273 of fact. Although Leonhart, Inc., as has been stated, changed to a cash method 464 of reporting American Fire income, it deducted $5,000 in its income tax return for 1960 to reflect a part of the commissions received by it in 1960 but which it anticipated would have to be refunded later in 1961. In 1961 the refund was made in the amount of $13,411.81. In 1961 Leonhart, Inc., deducted this amount, less the $5,000 deducted in 1960, or $8,411.81, from its gross income for 1961. This treatment of the refund by Leonhart, Inc., was not questioned by the respondent for either of the years 1960 and 1961 although the entire amount was paid in 1961 and the obligation could not have accrued before 12:01 A.M., January 1, 1961, the effective date of the amendment to Contract No. 4112, which occasioned the necessity of the refund. For the third and fourth quarters of 1961 Leonhart, Inc., would have had accrued income of $30,525.23 in American Fire commissions under its old method of accounting. However, because of its change in accounting it did not report this item of income for 1961 since it had not been received by it in cash in that year. The net effect of Leonhart, Inc.'s change in *274 method of accounting for American Fire commissions from an accrual to a cash method was to defer income of $14,929.08 from 1960 to 1961 and to defer from 1961 to 1962 a net amount of $15,596.15 ($30,525.23 minus $14,929.08). This change in method of accounting was made without the consent of the Commissioner. Petitioners' first contention is that respondent's notice of deficiency reflected, erroneously, a determination that petitioners, rather than Leonhart, Inc., had changed their method of accounting. From this they conclude that the question of a change of accounting method by Leonhart, Inc., did not appear in respondent's notice of deficiency and that therefore respondent has the burden of proof on this issue. Petitioners rely on the following Explanation of Adjustments attached to respondent's notice of deficiency: 1. It is determined that gross income was understated for the years 1960 and 1961, in the respective amounts of $14,929.08 and $15,596.15 caused by a change in your method of accounting from that previously used by you to compute your income. We are unable to agree with petitioners' contention. Respondent's "Exhibit A" attached to his notice of deficiency, which *275 contained the quoted pararaph relied upon by petitioners, indicated clearly that the increases in gross income determined by the respondent which are referred to in the above-quoted paragraph were due to the adjustment in the gross income of Leonhart, Inc. The paragraph in "Exhibit A" which precedes the quoted paragraph, supra, reads as follows: Explanation of the books and records of the Subchapter S Corporation known as Leonhart & Company, Inc., discloses that your distributable income for the taxable years 1960 and 1961 is $46,282.52 and $49,509.96, respectively, computed as follows: Following this paragraph is a list of items comprising "Corrected Subchapter S Corporation ordinary income," two of which are items of additional gross income for 1960 and 1961 in the respective amounts of $14,929.08 and $15,596.15, which are the same amounts as those contained in the succeeding paragraph of the statement relied upon by petitioners. That the language employed by respondent may have tended to obfuscate the nice distinction between an electing small business corporation and its sole shareholder does not change the fact that the determined increase in petitioners' income necessarily *276 resulted from a determination that their distributable income from their small business corporation, Leonhart, Inc., should be increased by the amount of $14,929.08 in 1960 and by the amount of $15,596.15 in 1961. Even though this determination is inartistically expressed it is nevertheless clear and was plainly understood by petitioners. "The reasons given in the notice of deficiency do not constitute the issues and the presumption of correctness of the respondent's determination is not destroyed by the reason given, even if it be unsound or badly expressed." Estate of Peter Finden, 37 T.C. 411, 423. The burden with respect to the instant issue remains with petitioners. Petitioners next argue that Leonhart, Inc., was free to change its method of accounting because such change took place in the year in which the Subchapter S election was made by it. Petitioners point out that Leonhart, Inc., was "a distinct corporate and taxable entity notwithstanding its Subchapter S election," citing John E. Byrne, 45 T.C. 151, aff'd 361 F. 2d 939. In this we agree. 465 But petitioners then argue that "Assuming the effect of the Subchapter S election *277 was to create a new taxable entity then such entity was free to elect its own accounting methods." [Emphasis ours] Petitioners advance no reason and cite no authority in support of the assumption that Leonhart, Inc., in 1960 was a new entity. Petitioners' position might have been well taken had Leonhart, Inc., been incorporated in 1960, but such is not the case. We are not aware of any provision of the Internal Revenue Code which would entitle an existing corporation which elects to be taxed as a small business corporation under Subchapter S to change its accounting methods without the consent of the Commissioner solely on account of such election, notwithstanding the provisions of section 446(e), I.R.C. 1954 infra. A third argument advanced by petitioners in justification of the change in the method of reporting American Fire commissions is that respondent has failed to show that petitioners' new method does not clearly reflect income. Respondent has adjusted the income of Leonhart, Inc., on the basis of the requirement of section 446(e), I.R.C. 1954[11] that a taxpayer who changes his method of accounting must first seek the permission *278 of the Commissioner. The regulations [12] amplifying this requirement make clear that such consent is required where a change in the overall method of accounting is made, or a change in the treatment of a material item, without regard to whether the taxpayer's new method accurately reflects income for the years in question. Taxpayers are required by the Code to employ a method of accounting that clearly reflects income, section 446(b), I.R.C. 1954, [13] and petitioners' position is tantamount to one which would require a taxpayer to seek the permission of the Commissioner to change his method of accounting only in those cases wherein a method not accurately reflecting income was contemplated. It is fundamental that income can be reported in a variety of ways any of which may be deemed to accurately reflect income for tax purposes, see section 446(c), I.R.C. 1954. American Fire commissions might well be accurately reported on either a cash or an accrual basis. But where the taxpayer make a change from one method of accounting to another certain distortion or "gaps" frequently result from the change even though the income for an individual *279 year may be said to be accurately reflected. Therefore, even though Leonhart, Inc., might properly have elected as an original matter to report American Fire commissions on either a cash or an accrual basis, it is required to obtain the consent of the Commissioner before it may change its method of accounting with regard to a material item. *280 A fourth argument of petitioners is that Leonhart, Inc., was not required to obtain the consent of the Commissioner in order to change its accounting for American Fire commission in 1960 because "[the] change was caused by circumstances beyond the control of the petitioners." The gravamen of this argument of petitioners is that since Leonhart, Inc.'s change in accounting was occasioned by a change in Contract No. 4112 over which it had no control and since this change occurred too late for Leonhart, Inc., to timely and Effectively secure the consent of the Commissioner to change its method of accounting for 1960, such consent was not required. We have found that the change made by Leonhart, Inc., in its accounting in 1960 was related to the change in Contract No. 4112. In addition, petitioners point out that Leonhart, Inc., could not have timely and effectively secured the consent of the Commissioner at the time it first learned of the impending change in Contract No. 4112 (on December 20, 1960) because such consent must be applied for 466 within 90 days after the beginning of the taxable year for which the change is subject. In this we agree. Section 1.446-1(e) (3), Income Tax Regs. *281 However, petitioners have cited no authority, nor have we found any, which would justify a suspension of the requirement of obtaining the consent of the Commissioner under these circumstances. Moreover, although Leonhart, Inc., might not have known of the change in the contract terms between American Fire and Lloyd's in time to seek the consent of the Commissioner for a change in 1960, such is not the case for 1961. Finally, petitioners maintain that the change was not material within the meaning of section 1.446-1 (e) (2) (i), Income Tax Regs., supra, footnote 12, which states that a change in the method of accounting for the purpose of section 446(e) "includes * * * a change in the treatment of a material item." Petitioners argue that the effect of the change was not material in 1960 in that the amount of income deferred in 1960 as a result of the change was $14,929.08 offset by $13,411.81 representing the amount of the refund alleged by petitioners to have accrued in 1960 which was paid in 1961 by Leonhart, Inc., or a net amount of $1,517.27. This argument appears to be predicated on a misconception of the pertinent regulation, which provides that *282 "a change in the method of accounting includes a change in the overall method of accounting for gross income or deductions or a change in the treatment of a material item," section 1.446-1 (e) (2) (i), Income Tax Regs., supra. It is obvious that "material item" should be read in context as "material item of gross income or deductions" and should not be construed as meaning "a material item of net income" nor as meaning a material difference between the amount of income computed under one method of accounting and that computed under another method. There can be no doubt that the commissions from American Fire constituted a material item of gross income. Total commissions from American Fire were $46,735.35 in 1960 and $33,103.94 in 1961. Commissions from American Fire were material both absolutely and with relation to petitioners' gross income in 1960 of $186,442.93 and in 1961 of $210,990.95. However, petitioners also contend that there must be a substantial change in the material item, see Dorr-Oliver, Inc., 40 T.C. 50, 54, and that there has been no such substantial change in this case. In our opinion, petitioners' argument with regard to *283 the substantiality of the change is not convincing. In their view the effect of the change in 1960 was to increase the taxable income of Leonhart, Inc., in the net amount of only $1,517.27 representing the difference between $14,929.08 (the amount of the commissions accruable but not received in that year) and the $13,411.81 which Leonhart, Inc., was required to refund to American Fire. While Leonhart, Inc., was required to make a refund of commissions in an amount ultimately determined to be $13,411.81 and made such refund on July 19, 1961, it accrued and deducted this refund on its books in 1960 in the estimated amount of $5,000 even though no obligation to make the refund arose until January 1, 1961. The balance of such refund ($8,411.81) was deducted by Leonhart, Inc., in 1961. The respondent has not questioned the right of Leonhart, Inc., to deduct $5,000 in 1960 and $8,411.81 in 1961 on account of this refund. Under these circumstances we think that this refund item is not relevant in a calculation of the net distortion of income attributable to Leonhart, Inc.'s change in accounting method. [14] The understatements of the income of Leonhart, Inc., attributable to its change of *284 accounting method are in the amounts of $14,929.08 for 1960 and $15,596.15 for 1961. In our opinion this change was and is substantial. For the above reasons we decide this issue for the respondent. 467 Issue 4: "Salaries" of Petitioners' Sons Our findings of fact regarding this issue indicate clearly that neither petitioners' son Bill nor their *285 son Jay performed any substantial services which furthered the business of Leonhart, Inc., other than those services performed by Bill in the first half of 1960 for which a salary deduction was allowed by the respondent. Jay was away from Baltimore for virtually the whole period in which he was receiving a "salary" of $200 per month and the only activity performed by him relating to the business of Leonhart, Inc., was to be present at one or two business conferences held in Boston in December of 1960. Although Bill did spend some time, at Harold's request, translating from French and German some written material having to do with reinsurance, we are convinced that Leonhart, Inc., had little or no interest in the translation for its own sake. Neither have petitioners shown that the periodic payments made to Bill and Jay which are here in issue were in consideration of their occasional efforts to entertain friends and clients of Harold, by playing music. [15]
*286 Petitioners' primary argument on this issue is that the amounts paid to Jay and Bill are deductible by Leonhart, Inc., as salary not because they were made for the purpose of obtaining the services of Bill and Jay which could be considered realistically as a quid pro quo for such payments, but because they were paid in an effort to interest the boys in its business and constituted one of "the Company's methods of inducing them into the business," the other "methods" being the "Music Club," "frequent communications" and "delegation of seemingly trivial tasks." Petitioners cite no pertinent authority for their argument. We have found Harold was interested in having Bill and Jay, both of whom were contemplating careers in music, enter his reinsurance business with the hope that one or the other or both of them might succeed him in its management. See our additional findings of fact for Issue 6. Both did elect to join the business in 1964, several years later. However, petitioners have failed to establish that the payments made to Bill and Jay were caused by Harold's desire to influence Jay and Bill in their choice of careers rather than by the personal motives of a father who desires *287 to finance the education of his children in a manner which would benefit him tax-wise. Petitioners have not shown that Jay was required to do anything which might increase his interest in the insurance business in order to "earn" the payments made to him, and we can see no significant relationship between these payments and Harold's interest in Jay's entering the reinsurance business. While Bill was brought into contact with a small amount of written material dealing with reinsurance which he might not have had if his father had not made the payments in question, we are not persuaded by the evidence adduced by petitioners that the disallowed payments made to Bill were other than sums advanced in the nature of an "allowance" to a son. In the letter from Harold to Bill sent just prior to the time when the disallowed payments were begun, portions of which we have set out in our findings of fact on this issue, Harold noted that he had just paid off a personal bank loan endorsed by a friend of Harold's which Bill had incurred and stated that "I would appreciate your not making any requests of anyone in the organization or anyone that I know for assistance of that type or financial assistance *288 - you can ask me." And in the letter written by Bill to Harold in connection with the payments here in question which we have quoted in our findings Bill writes that he is "not merely translating this book as a personal favor to you or for my own edification but as part of a project, for which you are responsible to the Internal Revenue * * *" and makes another reference to "the Internal Revenue" in connection with a "suggestion properly in terms of a feasible solution to the present situation." This strongly suggests that Harold's primary expressed interest in his financial arrangements with Bill was the deductibility of the payments arranged to be made to Bill rather than the usefulness to Harold or to Leonhart, Inc., of any work to be done by Bill. We find that the payments made to Bill and Jay in 1960 and 1961 disallowed by respondent were of a personal, non-deductible nature and we so hold. 468 The case cited by petitioners of Kilpatrick v. U.S., an unreported case ( S.D. N. Y. 1952, 44 A.F.T.R. 1040), is inapposite. In that case the employer made a payment of $3,000 to his son in 1943 while the son was in the armed services, during which period he admittedly *289 performed no services for the employer, although he had been employed by his father before the war and re-entered his employment after the war. A deduction was allowed pursuant to a ruling of the Commissioner which provided for the deduction of salaries paid during the Second World War to employees who are absent in the military service but who intend to return to their employment at the conclusion of the war. I.T. 3417, C.B. 1940-2, p. 64. In addition to the fact that the deduction was allowed primarily on the basis of the special ruling cited, the employee in Kilpatrick had completed his education and worked for his father for two full years prior to his entrance into the military and returned to this employment after the war. Petitioners have not argued the question of the deductibility of the employment taxes paid by Leonhart, Inc., apart from the question of the salary deduction itself. Respondent characterizes these payments as "voluntary payments in furtherance of a scheme of tax avoidance" and therefore "not payments of any true tax liability." A deduction for a tax paid but later determined to have been erroneously paid may be allowable in the year paid, Baltimore Transfer Co., 8 T.C. 1, *290 but only if the liability therefor was actual or apparent when paid. Cooperstown Corp. v. Commissioner, 144 F. 2d 693; Hart Furniture Co., 12 T.C. 1103, rev'd on another point; Kenyon Instrument Co., 16 T.C. 732. In the last three cases cited, wherein deductions for taxes paid were denied, the taxes were erroneously paid because of oversights on the part of the taxpayers involved and it was indisputable that no tax liability existed. Petitioners have likewise failed to establish by their evidence herein that there was an actual or apparent liability on the part of Leonhart, Inc., to pay the employment taxes relating to the disallowed salaries. On the authority of the Cooperstown, Hart, and Kenyon cases, supra, we hold that the deductions for employment taxes relating to the disallowed salaries were properly disallowed. Issue 5: The Shropshire Biography Our additional findings of fact relating to this issue are dispositive of it. It is well settled that deductions are a matter of legislative grace and that the taxpayer seeking a deduction bears the burden of pointing to an applicable statute and showing that he comes within it. New Colonial Ice Co. v. Helvering, 292 U.S. 435. *291 The Shropshire biography was written by Harold's brother. The subject of this biography, affectionately referred to by Harold as "Dr. Shrop," was the founder of the Civitan Club International and was a close personal friend of Harold's rather than a business associate. Harold was a member of the Civitan Club, which was a service organization, unrelated to the insurance business. Under the circumstances it would be difficult for petitioners to establish that the payments of Leonhart, Inc., in connection with the publication of this book constituted deductible business expenses of Leonhart, Inc., or of petitioners. They have failed to do so and we so hold. Issue 6: "The Leonhart Music Club" With regard to the deductibility by Leonhart, Inc., of expenditures and depreciation relating to the so-called "Leonhart Music Club," the only contention stated by petitioners in the pleadings and on brief is to the effect that these deductions are proper since "the musical instruments were used for the entertainment of Harold's customers." Petitioners have adduced testimony to the effect that Bill and Jay were called upon to play before customers of Harold. The record also shows that Harold *292 himself was interested in music having at one time played an instrument in a symphony orchestra, that his father had been a dealer in musical instruments, that his entire family consisting of eight members was interested in music and played musical instruments and that the so-called "Music Club" acquired instruments including 2 pianos, an electric player piano, 2 ukeleles, a number of banjos and guitars, 2 flutes, a base [bass] fiddle, a bass, a recording instrument, a record player and a radio. The record before us does not disclose which, if any, of these instruments were used by Bill and Jay in connection with their very occasional entertainment of Harold's customers or explain the necessity of the purchase of over 469 $10,000 worth of musical instruments for these occasions. In our opinion, the evidence as a whole indicates that the musical instruments were acquired and the expenditures relating to the "Music Club" were made for the primary reason that Harold had a personal interest in the collection of musical instruments, that he and his entire family derived pleasure from music and the playing of musical instruments, and that Harold took great personal pride in the musical *293 talents of his children. The evidence adduced by petitioners on this issue fails to prove that a substantial reason for the acquisition of the musical instruments and the expenditures by Leonhart, Inc., was to furnish musical entertainment to the customers and prospective customers of Leonhart, Inc., for the purpose of stimulating its business and increasing its profits. There are vague suggestions in the record to the effect that petitioners intended the operation of the "Music Club" to be a profitable business enterprise regardless of its effect on the sale of reinsurance. The evidence would not support such a contention, and, as we have indicated it was not made by petitioners on brief. Petitioners do make the observation on brief that "[the] musical activity appears on much too vast and professional scale as to be classified as personal." Petitioners are apparently referring to the musical activity of Bill and Jay, who were members of a musicians' union and played professionally during the taxable years. The evidence indicates that Bill earned up to $14 per hour performing in hotels and at private parties and that Jay played with a professional orchestra in the summer of *294 1961. However, the only evidence of "income" of Leonhart, Inc., which could be attributed to the "Music Club" was a copy of a bank deposit slip dated September 14, 1961, which indicated that Leonhart, Inc., had been credited with $100 representing a "performance fee" of William H. Leonhart, II. There was no testimony with regard to this deposit. [16] Any "vast and professional scale" of musical activity appears to be in the professional musical appearances of Bill and Jay as individual musicians earning money on their own account. We are unable to see how the individual professional activity of Bill and Jay could be relevant to the question of whether the expenditures and depreciation of Leonhart, Inc., here in issue are properly deductible. Petitioners have failed to establish any significant relation between the expenses and depreciation related to the *295 "Music Club" and the business of Leonhart, Inc., and respondent's determination is upheld on this issue. Issue 7: Deductions Relating to Leonhart, Inc., Automobiles Petitioners take the position that the burden of proof regarding this issue has shifted to respondent because (1) "the number of mathematical errors in [schedules relied upon by the respondent in making his determination] is appalling" and (2) the procedure used by the respondent was arbitrary. They further contend that "the best evidence of automobile expenses and depreciation is the contemporaneous entries made on the books of the company." Since many of the "appalling errors" referred to by petitioners are erroneous figures appearing in the books of Leonhart, Inc., itself or supplied by petitioners and since petitioners have pointed out in their briefs specifically only two such errors, one a $.43 mistake in addition and the other a misallocation of an amount of $11.21 as between two of the Leonhart, Inc., automobiles, it is our opinion that petitioners have failed to establish that a presumption of correctness should not attach to the respondent's determination because of mathematical errors. It is also our *296 opinion that petitioners fail in their contention that respondent's method of determining which of the cars was used and in what proportion, if any, for business purposes, and of allowing a deduction for that proportion of the amount established to have been expended for that vehicle was arbitrary. Petitioners offered a great deal of evidence relating to the total amounts expended by Leonhart, Inc., for its various automobiles. We have found in our findings of fact that the sums claimed as expended by Leonhart, Inc., were so expended. However, petitioners offered virtually no evidence as to the business use, if any, to which any of the automobiles were put. The evidence introduced relating to such 470 business use was vague, general, and unpersuasive. Petitioners have failed to convince us that any member of the Leonhart family other than Harold used any of the company automobiles for business purposes to more than a negligible extent. Petitioners have further failed to establish that any member of the family other than Harold and Bill was a bona fide employee of Leonhart, Inc., and drove any of the cars as a "fringe benefit." [17]
*297 Although petitioners offered only the unsupported testimony of the accountant of Leonhart, Inc., to establish that a 1959 Cadillac was kept in Florida for the use of Harold as well as officials of the American Fire and Casualty Co., we have determined that the Cadillac was so maintained. We also have determined that the Chevrolet used by Margaret Sands was used by her to the extent of 50% although we have been unable to determine the extent or purpose of Mrs. Lindsay's use of the 1951 Ford. Respondent contends that no amounts expended by Leonhart, Inc., on automobile expenses for the benefit of Leonhart, Inc., employees are deductible unless the automobile was used in connection with and for the direct benefit of the business of Leonhart, Inc. We think otherwise. We have found in our findings of fact that one employee of Leonhart, Inc., Margaret Sands, had the use of a 1957 Chevrolet approximately 50% of the time. Respondent has not contended that the relation between Harold or his company and this employee was anything other than a business relationship or that Leonhart, Inc., intended to make a gift to this employee of the use of a company automobile. In our opinion the record *298 requires a conclusion that Leonhart, Inc., permitted this employee to make use of the automobile for its own business purpose, either to improve employee relations or supplement compensation paid in cash to this employee or for both reasons. These expenses are therefore deductible as ordinary and necessary business expenses of Leonhart, Inc., to the extent indicated. See McCoy-Brandt Machinery Co., 8 B.T.A. 909; and Cecil R. Hopkins, 30 T.C. 1015, rev'd on another issue, 271 F. 2d 166. The question of the includability of any portion of these sums in the income of the employee is not before us. We think the respondent was justified in disallowing any deduction for amounts spent on gasoline, license plates, etc., which could not be allocated to any particular car since no evidence was introduced which would indicate, even in a general way, the relative use to which the various individual cars were put. To sum up, we are holding that in addition to the deductions for expenses and depreciation relating to automobiles allowed by respondent, the following deductions are allowable to Leonhart, Inc.: (1) $11.97 and $11.50 for repairs to the 1958 *299 Chrysler in 1960 and 1961 respectively. (2) 50% of the amounts claimed for repairs on the 1957 Chevrolet for the years 1960 and 1961. (3) $121.43 for repairs to the 1959 Cadillac in 1960. The respondent's determination is upheld in all other respects, including his disallowance of a claimed loss on the sale of a 1957 Cadillac driven primarily by Martha and the expenses incurred in returning a Jaguar from New York to Baltimore, neither of which automobiles was shown to have been used in the business of Leonhart, Inc., and also including his disallowance of unsubstantiated deductions claimed on account of the cost of repairs to an automobile of some undisclosed business associate and on account of the cost of what is described as "paint purchased through petty cash" for "repairs for business." No evidence was introduced with regard to the last two items. Issue 8: Legal Expenses In its return for 1961 Leonhart, Inc., claimed certain deductions on account of professional services. Respondent here disallowed $1,200 of such deductions as representing "an expenditure unrelated to the business activity of Leonhart & Company, Inc." A voucher indicating that the payment of $1,500 was *300 for the account of Harold, Leonhart, Inc., Leonhart and Co. of Maryland, Inc., and Southern Underwriters is the only evidence in this record bearing on the services for which payment was made. Petitioners have failed to show that any part of the amount paid in addition to the deductions allowed by the respondent 471 was a business expense of Leonhart, Inc. See Forcum-James Co. 7 T.C. 1195, 1219. Petitioners have advanced the contention that respondent's partial disallowance of this deduction for legal fees could only be valid if it was specifically made pursuant to the authority granted by section 482, I.R.C. 1954. In our opinion this argument is without merit. Issue 9: Travel and Entertainment Expenses Many of the items claimed by Leonhart, Inc., as deductions for travel and entertainment expense are determined on the basis of our findings of fact and do not require further discussion herein. The petitioners have failed to prove that the expenditures relating to the following items were ordinary and necessary business expenses of Leonhart, Inc.: (1) the expenses of the South American tour, (2) the payment to the Merchants Club, (3) the *301 payment to the Diner's Club, (4) the expenses of the Nassau and Miami trip, except to the extent of 1/8 of the $265.22 paid to American Airlines relating to the trip, or $33.15, representing Harold's share, (5) expenditures for flowers, except to the extent of a payment of $15.46 in 1960 relating to "Hayes" and "Porter," (6) the payment incident to the F.B.I. "Steak-Out," and (7) the payment to the University Club of Orlando. Petitioners have established that payments for flowers in 1960 to the extent of $15.46 relating to "Hayes" and "Porter," business associates of Leonhart, Inc., and 1/8 of the payment of $265.22, or $33.15, representing Harold's share of expenses of the Nassau and Miami trip (rather than the 1/9 share, or $29.47, allowed by the respondent) are valid business expenses of Leonhart, Inc., for 1960. Respondent's primary contention regarding Leonhart, Inc.'s claimed deductions in 1960 for the expenses relating to Englewood Lodge of $1,200, gifts to American Fire and Casualty officials of liquor in the amount of $843.40, and entertainment of American Fire officials on the occasion of the 33rd anniversary of that company costing $859.31 is that these items were properly *302 business expenses of Southern Underwriters, Inc., rather than Leonhart, Inc. We think this contention is without merit. Formally, Leonhart, Inc., usually dealt with American Fire and Casualty through Southern Underwriters, Inc., and we have so found in our findings of fact. However, it is obvious that in reality the source of the reinsurance commissions received by Leonhart, Inc., was the American Fire and Casualty Co. This is demonstrated by the fact that Leonhart, Inc., reported a total of $46,735.35 in commissions from American Fire and Casualty in 1960. With regard to these items we decide in favor of petitioners. Petitioners have argued strenuously for the deductibility of various expenditures of Leonhart, Inc., relating to the expenses of Martha while traveling with Harold on business. These include the expenses incurred on her account in 1960 in Richmond, Virginia, on trips to Nassau and London, her rail fare to New York, and in 1961 her hotel expenses in New York and San Francisco. The portion of the expenditures in connection with these trips and visits which related to Harold was allowed by respondent. In addition to these disallowed expenses of Martha are amounts claimed *303 as deductions in 1961 representing Martha's portion of expenses at a variety of hotels which were paid by Harold and not reimbursed by Leonhart, Inc. These unreimbursed expenditures relating to both Harold and Martha enumerated in our findings of fact, were disallowed by the respondent in their entirety. It has not been established on this record that Martha served any other than a social function while traveling with Harold on business. Petitioners do not contend that she took any part whatsoever in the discussion or transaction of business, but rather that her presence facilitated the development of a closer relationship between Harold and a prospective client. Petitioners state on brief that "[it] is very helpful for a reinsurance broker to have his wife along on a [business] trip * * * and especially helpful if the client can also have his wife present." Although the testimony regarding the functions performed by Martha while away from home with Harold was of a very general nature and although Martha herself testified only very briefly, we do not doubt that Martha was helpful to Harold when she accompanied him on business trips. But this is not enough to qualify the expenditures *304 as "ordinary and necessary expenses paid * * * in carrying on [a] trade or business" within the meaning of section 162. We said in L. L. Moorman, 26 T.C. 666, at 679: The petitioner testified that his wife assisted him in his work while on these business trips and that she was of help 472 in entertaining the dealers. However, the evidence does not establish that her services were necessary, although they may have been helpful. The evidence here is not sufficient to show that these expenditures on behalf of the wife were not family expenses [and thus] non-deductible. We think this statement applied with equal force in the instant case. See Alabama-Georgia Syrup Co., 36 T.C. 747, 769, reversed sub nom. L. B. Whitfield v. Commissioner on other grounds, 311 F. 2d 640; Walter M. Sheldon, 299 F. 2d 48, affirming a Memorandum Opinion of this Court. The respondent disallowed not only the expenses of Martha relating to the London trip but also those of Mrs. Madgett, who, with her husband, a business associate of Harold, accompanied the Leonharts on the trip. Neither petitioners nor respondent have attempted to distinguish these *305 expenses from those of Martha, but we think they stand on entirely different footing. Although it has not been established, nor was it claimed, that either Martha or Mrs. Madgett took any formal part in the transaction of business on the London trip, we are convinced that the expenditures made by Leonhart, Inc., on behalf of the latter were made for business rather than personal reasons. Madgett testified that he was in a position, as vice president of Mutual of Omaha, alone or in conjunction with others, to decide which broker would be selected to handle the company's reinsurance business. He further testified that the relation between him and Harold was of a business rather than social nature, which testimony was not contradicted. Whether the expenses of Mrs. Madgett are deemed to be "travel" expenses or "entertainment" expenses, we think petitioners have sustained their burden of establishing that they were paid by Leonhart, Inc., for business reasons, a burden they have not sustained regarding the expenses of Martha. [18] We have, therefore, held that the expenditures made by Leonhart, Inc., relating to the expenses of the Madgetts on the London trip, less the $750 reimbursement *306 made by them, is deductible by it. Leonhart, Inc., claimed as deductions for 1960 and 1961 the amounts of $343.13 and $621.41 respectively, representing liquor expense. Although these expenditures represent liquor consumed on the premises occupied by Leonhart, Inc., Leonhart and Co. of Maryland and Southern Underwriters, Inc., petitioners made no attempt to allocate the expense among the three corporations. Rather, they take the erroneous position that Leonhart, Inc., is entitled to the full deduction because Leonhart and Co. of Maryland and Southern Underwriters claimed no deduction for any part of these amounts nor could they have since the amounts were paid by Leonhart, Inc. This fact, even if true, does not transform business expenses of Leonhart and Co. of Maryland and Southern Underwriters into a business expense of Leonhart, Inc. In the absence of any evidence as to the proper allocation of the liquor expenses as among the three related *307 corporations, we have determined that Leonhart, Inc., is entitled to 1/3 of the amounts claimed for each year. Cohan v. Commissioner, 39 F. 2d 540. Leonhart, Inc., claimed as a deduction in the amount of $411 in 1960 the cost of first editions of a Johnson Dictionary and Boswell's Life of Johnson. These books were kept in the offices of Leonhart, Inc., and used as "talking points" with customers of Leonhart, Inc., particularly those from London, until 1966, at which time they were donated to an educational institution. Petitioners claim on brief that if the cost is not allowable as an expense in 1960, it should be properly amortized over the six years that the books were held by Leonhart, Inc. It was Harold's testimony that the books were worth more than $411 at the time they were donated. Petitioners have failed to establish that the useful life of the books in the business of Leonhart, Inc., was less than one year or that their salvage value was less than cost during 1960 and 1961. The respondent's determination is therefore sustained with regard to this item. Among the deductions claimed by Leonhart, Inc., in 1961 on account of travel expenses were deductions *308 of expenditures incident to a trip to Europe of Harold and James O. Honeywell, an officer of the New Amsterdam Insurance Co. These included the sums of $1,751.16 for "Steamer" and $611.37 for "Mayfair Hotel." Respondent disallowed the deduction of one-third of the expenses for "Steamer" and one-half 473 of the expenses involved in the item "Mayfair Hotel" or a total of $889.38. Just before leaving on the trip Honeywell gave his check to either Harold or Leonhart, Inc., for $875.58 as repayment of one-half of the expenditures made by Leonhart, Inc., on account of "Steamer" expenses. Accordingly it is obvious that the unreimbursed expenditures of Leonhart, Inc., in connection with any travel expenses of Honeywell amounted to only $13.80, which amount we determine to be a deductible business expense of Leonhart, Inc. With regard to petitioners' alternative contention that they are entitled to deduct the amount of $875.58, which was the proceeds of Honeywell's reimbursing check, we point out that there was no convincing proof offered by petitioners as to the times when or the purposes for which Harold paid out these proceeds. Of the items claimed by petitioners on their amended petition *309 as business expenses of Harold for 1961, the following items have not been proved to be either business expenses of Harold or of Leonhart, Inc.: (1) checks cashed by Harold in even amounts at various hotels totaling $2,325, (2) a payment to the Mecca Restaurant, (3) payments to Berger A. Gustafson, and (4) expenses of Harold and of Harold and members of his family at the various hotels enumerated in petitioners' amended petition. Petitioners have failed to prove that the memberships purchased by Harold at the Playboy Club in Chicago and the University Club of Orlando did not have a useful life beyond the year of acquisition or that their benefits were not of an indefinite duration. Therefore, the respondent's determination is upheld with respect to these two items. Mercantile National Bank at Dallas, 30 T.C. 84, 95. Of an amount of $137.51 paid to the Swetman Travel Service by Harold representing the cost of transportation of Harold and Michael Wheeler from Orlando to Baltimore, petitioners have established that the 1/2 relating to Harold's travel is deductible by petitioners as an ordinary and necessary travel expense of Harold in his capacity as an officer of Leonhart, *310 Inc. Section 162(a) (2). The portion of the expenditure relating to Wheeler has not been proved to be related to any business of Harold or of Leonhart, Inc. Although the check drawn by Harold to the order of "The Evergreen Annual," a Loyola College (Maryland) yearbook, bore the notation "contribution," Harold testified that the payment was on account of a business advertisement relating to Leonhart, Inc. The respondent has accepted this characterization of the payment as a business expense but contends that the item is not deductible by Harold because it was an expense of Leonhart, Inc., rather than of Harold individually and at the same time would not be deductible by Leonhart, Inc., since it was not paid for by it. We think this amount, paid by Harold and not reimbursed by Leonhart, Inc., is properly deductible by petitioners. Deductions have been allowed to sole shareholders of corporations for expenditures made by them in connection with the corporations where reason exists to disregard the distinction between the corporation and its owner. Archibald R. Watson, 42 B.T.A. 52, affirmed, 124 F. 2d 437. Under the circumstances present herein, i.e., the *311 election by petitioners themselves to have Leonhart, Inc., in effect disregarded for tax purposes by their election to have it treated as a small business corporation under Subchapter S and the inability of petitioners to gain any tax advantage by attempting to shift this deduction from Leonhart, Inc., to themselves, we decline to uphold the determination of the respondent with respect to this item. Issue 10: Deductions Alleged to Have Been Claimed for the First Time On Brief We have found in our findings of fact that Harold expended $275.57 and $1,155.67 in 1960 and 1961 respectively for liquor consumed at the Leonhart residence for which Harold was not reimbursed by Leonhart, Inc., or any other corporation and which was utilized to the extent of one-half in business entertaining by Harold. We further found that petitioners made a payment of $50 in 1961 to the "St. Mary's Building Fund," which constituted a payment to a qualifying organization under section 170, I.R.C. 1954. The respondent has made no contention contrary to these findings. Petitioners allege that they made cash contributions to a church averaging $10 per week, or a total of $520 for each *312 of the years 1960 and 1961. With regard to this item, Harold's uncorroborated testimony may be fairly summarized as follows: that he made cash contributions during 1960 and 1961 to a church which he believed was St. Mary's Church of Govans, that the amount he gave depended on "the number of persons attending with [him] or whether [he] 474 put up the money for them or whether they had the money themselves" and that he thought it would average "close to $10.00 a week cash." From the whole record herein we are satisfied that petitioners were active members of the Roman Catholic Church and had an established pattern of giving to its causes. While we are accordingly satisfied that petitioners made cash contributions to their church we are not satisfied by the testimony with regard to the amount thereof. Applying the so-called Cohan rule we have determined as an ultimate fact that the deductible amount of such cash contributions to petitioners' church was $200 in each of the years 1960 and 1961. The respondent takes the position that deductions in respect to these items should not be allowed because in his view the question of their deductibility was raised for the first time *313 on brief. We disagree. In an amendment to their petition petitioners raised the general question of "additional deductions not claimed on their 1960 and 1961 individual tax returns representing unreimbursed business expenses and unclaimed charitable contributions…" The portion of the stipulation entered into by the parties relating to the amended petition and set out in our finding refers to a "summary" of contributions and unreimbursed business expenses for 1961. There is no language in the stipulation indicating that the "summary" was intended to be such a complete schedule of all the specific items intended to be covered by petitioners' amendment as to preclude the consideration of any additional items of the types referred to in the amendment. In fact, a contrary inference is to be drawn from the fact that the amendment refers to contributions and unreimbursed business expenses for 1960 and 1961 whereas the stipulated paragraph and exhibit referred to therein relate only to contributions and expenses for 1961. Furthermore, we think any possible ambiguity regarding the scope of the amendment to petitioners' petition was resolved at the hearing, at which time Harold testified *314 with respect to each of the three items discussed under the issue without objection by counsel for respondent and petitioners introduced in evidence, also without objection from counsel for the respondent, exhibits relating specifically to two of these items (although there were no exhibits introduced relating to the cash contributions to a church). We think that the questions of the deductibility of the unreimbursed liquor purchases, the contribution to the "St. Mary's Building Fund" and the weekly church contributions were properly before the Court, that respondent has in no way been surprised or disadvantaged, and that the deductions should be allowed to the extent indicated. See Arthur C. Ruge, 26 T.C. 138. Issue 11: Expenses of Summer Home Although Harold testified that Sherwood Forest was used to entertain employees and clients of Leonhart, Inc., and Jay Leonhart and Richard Lurito, a school friend of Jay's, testified that Bill and Jay entertained employees and customers of Leonhart, Inc., at Sherwood Forest with their music, none of them identified even one employee or customer who was so entertained nor indicated when such entertainment took place. Harold *315 testified that he went up to Sherwood Forest twice a week in the summer, but his daily calendar for the summer months of 1960 indicates that he was out of town almost half the time and fails to reflect even one instance of Harold's taking an employee or customer to the Sherwood Forest home. Although in 1956 Martha extended a written invitation to the employees of Leonhart, Inc., to visit Sherwood Forest at any time through July 1, 1957, there is no evidence on this record that this invitation was renewed in any subsequent year. Under the circumstances, we think petitioners have failed to establish that the Sherwood Forest property was used to any material extent for the entertainment of employees or clients of Leonhart, Inc., and the claimed deduction for maintenance expenses thereon is accordingly disallowed. Issue 12: Negligence Penalty It is the respondent's determination that at least part of the deficiencies in petitioners' tax for the years 1960 and 1961 were due to their negligence or intentional disregard of rules and regulations but without intent to defraud and that therefore petitioners are liable for a 5% addition to tax pursuant to section 6653(a). [19] This determination *316 by the 475 respondent is presumptively correct, and it is incumbent upon the petitioners to convince us that such a determination is erroneous. David Courtney, 28 T.C. 658, 669-670. We think petitioners have failed to do so. The record is replete with evidence of deductions erroneously claimed by petitioners on grounds which were obviously untenable. See Fihe v. Commissioner, 265 F. 2d 511. As examples of acts which, taken in their entirety, constitute in our opinion negligence within the meaning of the statute, we point to the following: (1) The deduction of 100 percent of the depreciation on the automobiles held in the name of Leonhart, Inc., regardless of the obvious and conceded fact that many were used to a considerable extent for personal rather than business purposes. (2) The computation of depreciation on some of the automobiles (including the most expensive) held in the name of Leonhart, Inc., without ascribing salvage values to them as was done with the other automobiles. (3) The deduction by Leonhart, Inc., of depreciation on approximately $10,000 worth of musical instruments including 2 pianos, an electric player piano, a record player and a radio, without any attempt to show a valid business purpose for the acquisition and ownership by Leonhart, Inc., of a number of these instruments. (4) The inclusion in the deduction taken on account of "Music Club" expenses of amounts paid for music lessons given to three of petitioners' children. (5) The deduction as a business expense by Leonhart, Inc., of a number of payments made by it on account of restaurant and bar bills incurred by *317 petitioners' son Bill at times when it was obvious that Bill was not employed by Leonhart, Inc. (6) The deduction of depreciation on equipment used in connection with petitioners' summer house which had already been fully depreciated. Decision will be entered under Rule 50. Footnotes
1. During the taxable years Leonhart, Inc., had six vice presidents, including petitioner Martha, James C. Leonhart (Harold's brother), Lillian Claus (who was also Treasurer), and Otis Clark, who lived in San Francisco, was in some phase of the insurance business and with whom Leonhart, Inc., "had a substantial account." The duties, if any, of these vice presidents are not disclosed by the record.↩
*. The salvage value of this automobile shown on the "Automobiles Depreciation Schedule" (Petitioners' Exhibit 159) was zero. No explanation is given by petitioners as to why depreciation was calculated on this automobile without ascribing some salvage value to it. [This table has been constructed from Exhibit 177 and schedules A and B of respondent attached to his deficiency notice]↩
2. Since depreciation deducted on these cars (which included the 1958 Olds and the 1957 Cadillac) was disallowed in toto, it was not necessary for respondent to make any adjustments increasing the salvage values from zero, as in the case of the Chrysler Imperial.↩
3. Petitioners introduced at trial copies of a ledger account of Leonhart, Inc., for the years in question, schedules indicating the amounts claimed as a deduction and the amounts denied, and a summary of these schedules, all relating to "automobile expense," including repairs. Petitioners' summary varied somewhat from the schedules from which it was constructed although the totals of the amounts claimed and of the amounts denied were unchanged. Since the respondent has not challenged petitioner's figures as to the total amount expended by Leonhart, Inc., or their allocation of this amount as among various automobiles, we have adopted petitioners' summary as a true statement of the total amount expended by Leonhart, Inc., for "automobile expense" and of the allocation of such expenditures to particular automobiles, or to individual members of the Leonhart family.↩
4. The total amount claimed in 1961 for automobile expense was $4,209.81 reduced by $395 representing an amount credited to the expense account by Leonhart, Inc., for the receipt of insurance proceeds as a result of an accident damaging the 1953 Oldsmobile.↩
5. At the hearing petitioners agreed that the only part of the $189.90 disallowed related to the expenses of Martha and Mrs. Madgett. On brief petitioners contend that a part of the disallowed amount represented other business trips taken by Harold. Since no evidence was introduced relating any part of this amount to some other business trip of Harold, we will treat the entire amount disallowed as expenses relating to the wives of Harold and Donald Madgett on a trip which was of a business nature as far as the husbands were concerned.↩
6. Southern Underwriters also had an office in New York.↩
7. Although there is some evidence that a portion of this amount relates to traveling other than the Nassau and Miami trip, both parties apparently agree that the entire amount related only to that trip and we will so treat it.↩
8. Included among the photostats of this hotel bill and the check in payment thereof contained in petitioners' Exhibit 131 are photostats of two handwritten "memos" bearing the name "The Chapman Park." One of them reads as follows: "Father John J. Walsh - S.J. Dean, Marquette Univ. Pessimism - Cynicism - There is no love in a world that does not love God." The other reads as follows: "Man - conscious but bereft of purpose - Milton - Shaw - Mind is a Miracle - Matter is a fact."↩
9. SEC. 6037. RETURN OF ELECTING SMALL BUSINESS CORPORATION. * * * Any return filed pursuant to this section shall, for purposes of chapter 66 (relating to limitations), be treated as a return filed by the corporation under section 6012.↩
10. The question of the deductibility of this item as a business expense is discussed infra, under "Issue 9."↩
11. SEC. 446(e)↩. REQUIREMENT RESPECTING CHANGE OF ACCOUNTING METHOD. - Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate. 12. Sec. 1.446-1(e). Requirement Respecting the Adoption or Change of Accounting Method. (2)(i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. A change in the method of accounting includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a marital item. Consent must be secured whether or not a taxpayer regards the method from which he desires to change to be proper. Thus, a taxpayer may not compute his taxable income under a method of accounting different from that previously used by him unless such consent is secured. ↩
13. SEC. 446(b)↩. Exceptions. - If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.
14. The right of Leonhart, Inc., to have accrued any amount under their old accrual method of accounting as a deduction in 1960 on account of a refund is questionable since no obligation to make such refund arose until 1961. Therefore, if we should consider this refund as relevant to a consideration of the substantiality of the change in the material item and would apply Leonhart, Inc.'s old method of accounting to both the item of income (the $14,929.08) and the item of deduction (the $5,000) in 1960 it might well be that the income of Leonhart, Inc., would be increased by $14,929.08 and its deductions decreased by $5,000 because of the apparent non-accruability of this latter amount. This would result in the net distortion of Leonhart, Inc.'s income being $19,929.08 in 1960 instead of the $14,929.08 determined by respondent.↩
15. Presumably any payments from Leonhart, Inc., to Jay or Bill on account of their musical activity would have been reflected on the account of the "Leonhart Music Club." This account was credited with one unidentified payment of $100 during the years in question. See our additional findings of fact relating to "Issue 6."↩
16. We note that during September 1961, Bill received, from Leonhart, Inc., 3 checks for $100 each instead of the 2 checks for $100 received by him during the other months of 1960 and 1961 when he was purportedly employed by Leonhart, Inc., "at $200.00 per month." (See additional findings of fact relating to Issue 4, supra.)↩
17. It is conceded that Bill was employed by Leonhart, Inc., for the first five months of 1960. But petitioners have failed to prove that any repairs or other expense items relating to an automobile used by Bill were paid or incurred by Leonhart, Inc., during the period of Bill's employment.↩
18. We note that any question of the deductibility of an entertainment expense herein is to be decided under section 162 rather than the more stringent section 274, which was not effective until taxable years ending after December 31, 1962.↩
19. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩